

JOHN M. McCOY III, Cal. Bar No. 166244
E-mail:  mccoyj@sec.gov
ALKA N. PATEL, Cal. Bar No. 175505
E-mail:  patela@sec.gov
SPENCER BENDELL, Cal Bar No. 181220
E-mail:  bendells@sec.gov
MEGAN M. BERGSTROM, Cal. Bar No. 228289
E-mail:  bergstromm@sec.gov

Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Michele Wein Layne, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

FILED

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
2009 DEC 14  AM 10:54
BY...

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. SACV09-1470 JVS(MLGX) |
| Plaintiff, | |
| vs. | **DECLARATION OF JEFFREY LECKICH, CPA** |
| EAGLE DEVELOPMENT ENTERPRISES, INC., a Nevada corporation; EAGLE STORAGE & DEVELOPMENT, LLC, an Arizona limited liability company; EAGLE AVIATION SALES & LEASING, LLC, a California limited liability company; MICHAEL J. BOWEN, | |
| Defendants, | |
| and | |
| EAGLE ASSETS & MANAGEMENT, LLC, a California limited liability company; EAGLE HOUSING & DEVELOPMENT AZ, LLC, an Arizona limited liability company; EAGLE HOUSING & DEVELOPMENT, INC., a California corporation; and EAGLE HELICOPTERS & AVIATION, INC., a California Corporation, | |
| Relief Defendants. | |

TOTAL P.018

## DECLARATION OF JEFFREY LECKICH, CPA

I, Jeffrey Leckich, declare, pursuant to 28 U.S.C. § 1746, as follows:

    1.    I am a Certified Public Accountant licensed with the California Board of Accountancy. I have personal knowledge of each of the matters set forth below, and, if called as a witness, I could and would competently testify to the facts stated herein.

    2.    I make this declaration at the request of the Securities and Exchange Commission ("SEC").

    3.    For the past 20 years, I have provided accounting, consulting and business advisory services to clients in the real estate industry. For the period from 1999 through 2006, I functioned as the Partner-in-Charge of the Real Estate Services Group of Squar, Milner, Miranda & Williamson, LLP. Since 2006, I have primarily worked as an independent consultant to real estate companies. I have personally audited companies and have personally prepared audits for companies, in accordance with the standards established by the Public Company Accounting Oversight Board.

    4.    In or around January 2008, I was contacted by Michael Bowen about conducting audits of several of his companies. On January 17, 2008, I entered into a contract with Eagle Management Enterprises, Inc. ("Eagle Management") to audit various affiliated companies, including Eagle Storage & Development, LLC ("Eagle Storage"), Eagle Development Enterprises, Inc. ("Eagle Development"), and Eagle Assets & Management, LLC ("Eagle Assets") (collectively, the "Eagle Entities") for the years ended December 31, 2006 and December 31, 2007. Bowen was the manger of Eagle Storage and Eagle Assets and the president and CEO of Eagle Development. Bowen told me that the purpose of the audits was to facilitate a public offering on the AIMS market of the London Stock Exchange or the PLUS market located in the United Kingdom. When I was retained, Bowen informed me that the Eagle Entities never had any audited financial statements.

    5.    Bowen directed the accounting manager for the Eagle Entities, Marcos Mancenido, to provide me with copies of the general ledgers for Eagle Storage and

1 Eagle Assets for the period from January 1, 2005 through December 31, 2007 so that
2 I could begin my audit work. In or around January 2008, Mancenido provided me
3 with copies of the general ledgers for Eagle Storage and Eagle Assets for the period
4 from January 1, 2005 through December 31, 2007 along with some other documents,
5 including check registers and deposit details. I never received a general ledger for
6 Eagle Development.

7      6.    On November 4, 2009, I provided copies of the general ledgers I
8 received from Mancenido to the SEC.

9      7.    I never moved past the initial planning stages of the audits because of the
10 inadequate state of the Eagle Entities' books and records and Mr. Bowen's refusal to
11 answer basic questions about the Eagle Entities' books and records. During my
12 initial planning work, I reviewed the general ledgers and had questions about a
13 significant number of transactions reflected on the general ledgers, including transfers
14 and loans to various entities owned or controlled by Mr. Bowen. Mr. Bowen never
15 provided me with back up documentation relating to these transactions or a sufficient
16 explanation of these transactions so that I could move forward with the audits.

17      8.    In mid-2008, I informed Mr. Bowen that I could not complete an audit of
18 the Eagle Entities' because of his failure to provide me with the necessary
19 documentation.

20      9.    I stopped all work relating to the Eagle Entities in or around July 2009.
21 As of that time, the Eagle Entities did not have any audited financial statements.

22      10.    During the time I worked for Eagle Management, Bowen provided me
23 with copies of the private placement memorandums ("PPMs") for Eagle Storage,
24 Eagle Assets, and Eagle Development. In particular, Bowen provided me with copies
25 of an Eagle Storage PPM dated "November 1, 2003 as Amended and Restated on
26 May 1, 2004, and as Amended and Restated on January 1, 2006," an Eagle
27 Development PPM dated November 1, 2007, and an Eagle Development PPM dated
28 June 1, 2009. Bowen also provided me with a copy of a PPM dated March 6, 2009

2

1   for a company called Eagle Aviation Sales & Leasing, LLC.  A true and correct copy

2   of the Eagle Development PPM dated June 1, 2009 is attached hereto as Exhibit "1."

3      I declare under penalty of perjury under the laws of the United States of

4   America that the foregoing is true and correct.

5      Executed this 9th day of December, 2009 at Lake Havasu City, Arizona, California.

6

7

8                                   Jeffrey Leckich

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

CONFIDENTIAL PRIVATE PLACEMENT OFFERING MEMORANDUM

# EAGLE DEVELOPMENT ENTERPRISES, INC.

**$25,000,000 Maximum Offering**
**25,000,000 Shares of Common Stock**

**Offering Price $1.00 per Share [1]**
**Minimum Investment – Fifty Thousand Dollars ($50,000) [1]**

Eagle Development Enterprises, Inc., a Nevada corporation (the "Corporation") formed on March 26, 2007, hereby offers (the "Offering") a maximum of 25,000,000 shares of common stock ("Shares" or "Common Stock") of the Corporation at a purchase price per Share of $1.00. The minimum investment is Fifty Thousand Dollars ($50,000) for the purchase of fifty thousand (50,000) Shares, except as otherwise provided herein. The Corporation has elected to be taxed as a Real Estate Investment Trust ("REIT") as a consequence of which the Corporation will be entitled to certain tax benefits accruing to REITs generally. (See "Summary of Income Tax Consequences.") The Corporation has been organized for the purposes of (1) organizing, capitalizing, acquiring, and managing real estate entities engaged in various aspects of real estate, including, when and if opportunities arise, (i) development of new residential housing projects including development in Kingman, Arizona through the Corporation's wholly owned subsidiary Eagle Housing & Development AZ, LLC ("Eagle Housing AZ") (ii) development of residential rental real estate properties, (iii) development of assisted living facilities including board and care residential facilities, (iv) development of light industrial real estate properties, (v) development of residential apartment housing, (vi) development of public storage facilities, (vii) acquisition of developed and undeveloped real property in foreclosure, trust deed auctions, sales of bank owned real estate ("REO"), probate sales and private sales, and rehabilitation and sales of the properties ("Rehabilitation Development") and (viii) possible acquisition of membership interests of Eagle Assets and Development, LLC, a California limited liability company engaged in business of Rehabilitation Development ("Eagle Assets"), and/or Eagle Storage & Development, LLC, an Arizona limited liability company engaged in the business of owning and operating a storage facility in Lake Havasu City, Arizona ("Eagle Storage"); (2) engaging in a reorganization pursuant to which (a) the Corporation will become a subsidiary of a public liability company ("PLC") to be organized in the UK, upon which reorganization each shareholder of the Corporation will receive one thousand (1,000) shares of common stock of the PLC and ten (10) Shares of the Corporation in exchange for 1000 Shares of Common Stock of the Corporation (the "Reorganization"), and (b) provided the shareholders of the Corporation and a majority in interest of the Members of Eagle Assets and/or Eagle Storage approve of the reorganization, issue shares of stock of the Corporation and PLC to such Members in exchange for their Membership Interests in the those entities, as a consequence of which Eagle Assets and/or Eagle Storage will become subsidiaries of the Corporation. Michael J. Bowen is the President and Chief Executive Officer of the Corporation. (See "Management")

The Shares are being offered by the Corporation, its agents, and possibly broker-dealers. The Offering will terminate at the earlier of (i) July 31, 2008 or (ii) when all Shares being offered are sold (the "Offering Termination Date"); provided, however, that the Board of Directors of the Corporation (the "Directors"), in the Director's sole and absolute discretion, may (a) extend the Offering Termination Date to a date no later than December 31, 2008 or (b) terminate the Offering at any time. (See "Terms of the Offering".) The sale price of the Shares has been arbitrarily determined by the Corporation and does not necessarily bear any relationship to the Corporation's book value, assets, past operating results, financial condition, generally accepted accounting principles or any other established criteria for establishing value. (See "Terms of the Offering," "Risk Factors" and "Description of Securities")

This Confidential Private Placement Offering Memorandum (the "Memorandum") constitutes an offer only to the Offeree named in the space provided below. Delivery of this Memorandum to anyone else is unauthorized and any total or partial reproduction of this Memorandum or divulgence of its contents, without the prior written consent of the Corporation, is prohibited. By accepting delivery of this Memorandum, the Offeree named hereon agrees that if he or she elects not to make a purchase offer or his or her purchase offer is rejected, such Offeree will return to the Corporation this Memorandum and all documents delivered to the Offeree.

**THE SHARES OFFERED PURSUANT TO THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), QUALIFIED UNDER THE SECURITIES LAWS OF ANY OTHER STATE, NOR HAS THE SEC, OR ANY STATE SECURITIES LAW ADMINISTRATOR PASSED UPON OR APPROVED, DISAPPROVED, ENDORSED OR RECOMMENDED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. AN INVESTMENT IN THE SECURITIES OFFERED PURSUANT TO THIS MEMORANDUM INVOLVES SIGNIFICANT RISKS. (SEE "RISK FACTORS".) YOU SHOULD MAKE AN INDEPENDENT DECISION WHETHER THE OFFERING MEETS YOUR INVESTMENT OBJECTIVES AND FINANCIAL RISK TOLLERANCE.**

**EAGLE DEVELOPMENT ENTERPRISES, INC.**
2125 East Katella Avenue, Suite 350
Anaheim, California 92806
(1)(800) 394-9868

Memorandum No. _____

Offeree Name: _____

Exhibit ___1___  Page ___4___

# This is an addendum to the original package

| | Price to Public[1] | Fees, Commissions and Allowances[2] | Proceeds to the Corporation [3] |
|---|---|---|---|
| Per Share | $    1.00[1] | 20% | $    .80 |
| Minimum Purchase | $    50,000.00[1] | 20% | $    40,000.00 |
| Total Offering -- Maximum | $ 25,000,000.00[1] | 20% | $    20,000,000.00 |

(1)      The Offering price per share is$1.00, with a minimum investment of Fifty Thousand Dollars ($50,000) for the purchase of fifty thousand (250,000) Shares); provided, however, the Directors may accept subscriptions for fewer than 50,000 Shares ($50,000) in its sole discretion.

(2)      The Corporation may pay commissions, fees and non-accountable expenses in an amount up to 20% of the proceeds of any Shares sold by certain other broker-dealers who are members of the Financial Industry Regulatory Authority Inc. ("FINRA") who serve as placement agents on behalf of the Corporation, payable (i) up to 15% as commissions, (ii) up to 3% as non-accountable expenses for serving as the placement agent on behalf of the Corporation, and (iii) up to 2% for due diligence expenses.  In addition, the Corporation may agree to indemnify participating broker-dealers against certain liabilities under the Securities Act of 1933, as amended.  Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% of the proceeds to certain individuals who introduce investors to the Corporation.  As a result, the amount of proceeds to the Corporation will vary depending upon the status of the person selling the Shares. The Corporation will not pay any commissions, finders' fees or other amounts to the President or any other Officer or Director of the Corporation. (See "Terms of the Offering – Plan of Distribution.")

(3)      Before deducting legal, accounting, printing and miscellaneous expenses, which are estimated to be approximately $100,000.

## The address is 171 S Anita Dr. Suite 212 CA, 92868

## The Date of this Memorandum is June 1, 2009.

ii

Exhibit ___1___   Page ___5___

| | Price to Public[1] | Fees, Commissions and Allowances[2] | Proceeds to the Corporation [3] |
|---|---|---|---|
| Per Share | $          1.00[1] | 20% | $          .80 |
| Minimum Purchase | $     50,000.00[1] | 20% | $     40,000.00 |
| Total Offering -- Maximum | $ 25,000,000.00[1] | 20% | $ 20,000,000.00 |

(1)       The Offering price per share is $1.00, with a minimum investment of Fifty Thousand Dollars ($50,000) for the purchase of fifty thousand (250,000) Shares); provided, however, the Directors may accept subscriptions for fewer than 50,000 Shares ($50,000) in its sole discretion.

(2)       The Corporation may pay commissions, fees and non-accountable expenses in an amount up to 20% of the proceeds of any Shares sold by certain other broker-dealers who are members of the National Association of Securities Dealers, Inc. ("NASD") who serve as placement agents on behalf of the Corporation, payable (i) up to 15% as commissions, (ii) up to 3% as non-accountable expenses for serving as the placement agent on behalf of the Corporation, and (iii) up to 2% for due diligence expenses.  In addition, the Corporation may agree to indemnify participating broker-dealers against certain liabilities under the Securities Act of 1933, as amended.  Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% of the proceeds to certain individuals who introduce investors to the Corporation.  As a result, the amount of proceeds to the Corporation will vary depending upon the status of the person selling the Shares.  The Corporation will not pay any commissions, finders' fees or other amounts to the President or any other Officer or Director of the Corporation.  (See "Terms of the Offering – Plan of Distribution.")

(3)       Before deducting legal, accounting, printing and miscellaneous expenses, which are estimated to be approximately $100,000.

## The Date of this Memorandum is November 1, 2007

Exhibit ___1___ Page __6__

## INVESTOR NOTICES

THE SHARES OFFERED HEREBY ARE OFFERED PURSUANT TO EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, AND CERTAIN RULES AND REGULATIONS PROMULGATED THEREUNDER. THE CORPORATION HAS NOT MADE APPLICATION TO REGISTER THIS OFFERING OR THE SHARES BEING SOLD HEREUNDER WITH THE SEC, THE SECURITIES LAW ADMINISTRATOR OF ANY STATE, AND NO FEDERAL OR STATE REGULATORY AGENCY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM, NOR IS IT INTENDED THAT THEY WILL. SOLICITATION OR SALE SHALL NOT BE MADE TO ANY PERSON UNLESS THE CORPORATION HAS REASONABLE GROUNDS TO BELIEVE, AND DOES BELIEVE IMMEDIATELY PRIOR TO MAKING SUCH OFFER, SOLICITATION OR SALE, THAT SUCH PERSON, EITHER ALONE OR TOGETHER WITH ONE OR MORE PURCHASER REPRESENTATIVES, IF ANY, HAS SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE OR SHE IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE SHARES DESCRIBED IN THIS MEMORANDUM AND THAT SUCH PERSON MEETS SPECIFIC INVESTOR SUITABILITY STANDARDS MORE FULLY DESCRIBED HEREIN.

BECAUSE THESE SHARES HAVE NOT BEEN SO REGISTERED OR QUALIFIED, THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED HEREIN AND BY THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. PRIOR TO THIS OFFERING THERE HAS BEEN NO PUBLIC MARKET FOR THE SECURITIES OF THE CORPORATION, NOR WILL A PUBLIC MARKET DEVELOP AS A RESULT OF THIS OFFERING. HOWEVER, PROVIDED THE REORGANIZATION IS CONSUMMATED AS CONTEMPLATED BY THIS OFFERING, MANAGEMENT INTENDS TO REGISTER SHARES OF STOCK OF THE PLC RECEIVED BY THE PURCHASER IN PARTIAL EXCHANGE FOR SHARES OF THE CORPORATION ON THE PLUS MARKET IN THE UK, WHICH PLC SHARES, UPON LISTING THEREON, WOULD BE FREELY TRADEABLE.

THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE, AND AN INVESTMENT IN THE SHARES INVOLVES A HIGH DEGREE OF RISK, AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF HIS OR HER INVESTMENT. ALL INVESTORS MUST BE "ACCREDITED INVESTORS" AS DEFINED IN THE ACT AND THE REGULATIONS PROMULGATED THEREUNDER. ACCORDINGLY, INVESTORS WILL BE REQUIRED TO REPRESENT THAT THEY ARE ABLE TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT AND THAT THEY (OR THEIR PURCHASER REPRESENTATIVE) ARE FAMILIAR WITH AND UNDERSTAND THE TERMS AND RISKS OF THE OFFERING. THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN ATTORNEY, ACCOUNTANT AND/OR BUSINESS ADVISOR AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT. THE CORPORATION RESERVES THE RIGHT TO REVOKE THE OFFER AND REFUSE TO SELL TO ANY PROSPECTIVE INVESTOR IF, AMONG OTHER THINGS, THE PROSPECTIVE INVESTOR DOES NOT MEET THE SUITABILITY STANDARDS SET FORTH IN THIS MEMORANDUM. (SEE "WHO SHOULD INVEST – SUITABILITY STANDARDS", "TERMS OF THE OFFERING" AND "RISK FACTORS".)

PRIOR TO MAKING AN INVESTMENT DECISION RESPECTING THE SHARES OFFERED HEREBY, A PROSPECTIVE INVESTOR SHOULD CAREFULLY REVIEW AND CONSIDER THE ENTIRE MEMORANDUM. MOREOVER, A PROSPECTIVE INVESTOR SHOULD RELY SOLELY ON THIS MEMORANDUM AND THE EXHIBITS HERETO IN MAKING AN INVESTMENT DECISION. NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHOULD BE RELIED ON IN CONNECTION WITH THE OFFERING OF THE SHARES EXCEPT THIS MEMORANDUM AND THE STATEMENTS CONTAINED HEREIN. NO PERSON ACTING IN ANY CAPACITY WHATSOEVER, EXCEPT THE CORPORATION AND ITS AGENTS AND SUCH REGISTERED BROKER-DEALERS AS THE CORPORATION MAY ELECT TO UTILIZE, HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM AND SUPPLEMENTAL LITERATURE REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE CORPORATION. ACCORDINGLY, THE RECIPIENT HEREOF AGREES TO NOTIFY THE CORPORATION IN WRITING IF HE OR SHE RELIES UPON DOCUMENTATION AND/OR INFORMATION OTHER THAN AS PROVIDED HEREIN. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE THE IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION CONTAINED HEREIN SUBSEQUENT TO THE DATE HEREOF.

THE OFFERING PRICE OF THE SHARES HAS BEEN ARBITRARILY DETERMINED BY THE CORPORATION AND EACH PROSPECTIVE INVESTOR SHOULD MAKE AN INDEPENDENT EVALUATION OF THE FAIRNESS OF SUCH PRICE UNDER ALL THE CIRCUMSTANCES AS DESCRIBED HEREIN.

Exhibit ____1____ Page ___7___

THE INVESTMENT DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK AND IS OFFERED ONLY TO THOSE INDIVIDUALS WHO CAN AFFORD TO ASSUME SUCH RISKS FOR AN INDEFINITE PERIOD OF TIME AND WHO AGREE TO PURCHASE THE SHARES OFFERED HEREUNDER SOLELY FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TOWARDS A TRANSFER, RESALE, EXCHANGE OR FURTHER DISTRIBUTION OF SUCH SHARES.

THIS MEMORANDUM DOES NOT KNOWINGLY CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT A MATERIAL FACT AND ANY SUCH MISSTATEMENT OR OMISSION IS DONE WITHOUT THE KNOWLEDGE OF THE PREPARERS OF THIS DOCUMENT OR THE CORPORATION. AS SUCH, THE CORPORATION BELIEVES THAT THIS MEMORANDUM CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF ALL MATTERS, DOCUMENTS AND CIRCUMSTANCES MATERIAL TO THIS OFFERING.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL NOR THE SOLICITATION OF AN OFFER TO PURCHASE ANY OF THE SECURITIES OFFERED HEREBY IN ANY JURISDICTION IN WHICH AN EXEMPTION FROM REGISTATION DOES NOT EXIST OR TO ANY PERSON TO WHOM IT WOULD BE UNLAWFUL TO DO SO. THIS MEMORANDUM IS FOR THE PRIVATE USE OF THE RECIPIENT ONLY, AND MAY NOT BE DELIVERED TO OR RELIED UPON BY ANY OTHER PERSON OR COPIED BY ANY MEANS WITHOUT THE PRIOR WRITTEN APPROVAL OF MANAGEMENT OF THE CORPORATION. THIS MEMORANDUM IS AN OFFER SOLELY TO SUCH NAMED OFFEREE. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, TO ANY PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM IS DELIVERED, WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGEMENT OF THE CORPORATION, IS PROHIBITED. THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL ENCLOSED DOCUMENTS TO THE CORPORATION IF THE OFFEREE DOES NOT UNDERTAKE TO PURCHASE ANY SHARES OFFERED HEREBY. NONE OF THE SHARES DESCRIBED IN THIS MEMORANDUM WILL BE SOLD TO ANY PERSON WHO HAS NOT COMPLETED AND RETURNED A SUBSCRIPTION AGREEMENT SATISFACTORY TO THE CORPORATION, AND OTHERWISE ANSWERED ANY QUESTIONS POSED BY THE CORPORATION AND/OR ITS AUTHORIZED AGENTS.

CERTAIN OF THE INFORMATION CONTAINED IN THIS MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY TO THE CORPORATION, AND IS BEING SUBMITTED TO PROSPECTIVE INVESTORS SOLELY FOR SUCH INVESTORS' CONFIDENTIAL USE WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR EXPRESS WRITTEN PERMISSION OF THE CORPORATION, SUCH PERSONS WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED HEREIN OR MAKE REPRODUCTIONS OF OR USE THIS MEMORANDUM FOR ANY PURPOSE OTHER THAN EVALUATING A POTENTIAL INVESTMENT IN THE SHARES. BY ACCEPTING DELIVERY, THE RECIPIENT OF THIS MEMORANDUM AGREES TO PROMPTLY RETURN THIS MEMORANDUM TO THE CORPORATION AFTER SUCH TIME AS THE RECIPIENT IS NO LONGER CONSIDERING AN INVESTMENT IN THIS OFFERING.

THIS MEMORANDUM CONTAINS CERTAIN INFORMATION CONCERNING THE CORPORATION'S FUTURE PLANS AND PERFORMANCE. THERE CAN BE NO ASSURANCE THAT THE CORPORATION WILL BE ABLE TO SUCCESSFULLY IMPLEMENT ANY OF ITS PLANS OR THAT ASSUMPTIONS OR EXPECTATIONS REGARDING ITS FUTURE PLANS AND PERFORMANCE WILL NOT BE MATERIALLY DIFFERENT FROM THE CORPORATION'S PRESENT EXPECTATIONS.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE CORPORATION WITHOUT NOTICE. THE CORPORATION RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART FOR ANY REASON OR TO ALLOT TO ANY SUBSCRIBER LESS THAN THE NUMBER OF SHARES SUBSCRIBED FOR OR TO WAIVE CONDITIONS TO THE PURCHASE OF THE SHARES.

PROSPECTIVE INVESTORS WHO HAVE QUESTIONS CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING OR WHO DESIRE ADDITIONAL INFORMATION OR DOCUMENTATION TO VERIFY THE INFORMATION CONTAINED HEREIN SHOULD CONTACT THE CORPORATION. EACH OFFEREE MAY, IF HE OR SHE SO DESIRES, MAKE INQUIRIES OF THE CORPORATION WITH RESPECT TO THE CORPORATION'S BUSINESS OR ANY OTHER MATTERS RELATING TO THE CORPORATION AND AN INVESTMENT IN THE SHARES OFFERED HEREUNDER, AND MAY OBTAIN ANY ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION OR IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. THE CORPORATION WILL PROVIDE ALL SUCH INFORMATION, TO THE EXTENT THAT THE CORPORATION POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY OFFEREE WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE OFFEREE'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE CORPORATION. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE IN WRITING TO THE CORPORATION ADDRESSED AS FOLLOWS: EAGLE DEVELOPMENT ENTERPRISES, INC., 2125 EAST KATELLA AVENUE, SUITE 350, ANAHEIM, CALIFORNIA 92806, ATTENTION: MICHAEL J. BOWEN, PRESIENT.

Exhibit ___1___ Page ___8___

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT OR TAX ADVICE. PROSPECTIVE INVESTORS SHOULD CONSULT THEIR ADVISORS AS TO LEGAL, INVESTMENT, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT BY SUCH PROSPECTIVE INVESTORS IN THE CORPORATION. NO LEGAL, ACCOUNTING OR BUSINESS ADVISORS RETAINED BY THE CORPORATION FOR THE PREPARATION OF THIS MEMORANDUM SHALL BE LIABLE TO ANY INVESTOR FOR MALPRACTICE OR OTHERWISE, EXCEPT IN THE EVENT OF ACTIONABLE FRAUD. FURTHERMORE, SUBSIDIARIES, AFFILIATES, TRUSTEES, BENEFICIARIES, OFFICERS OR DIRECTORS THEREOF WILL NOT BE LIABLE TO INVESTORS FOR ANY REASON EXCEPT IN THE EVENT OF SUCH PERSON'S MATERIAL: (1) MISREPRESENTATION; (2) INTENTIONAL OMISSIONS; OR (3) RECKLESSNESS.

THE STATEMENTS CONTAINED HEREIN ARE BASED ON INFORMATION BELIEVED BY THE CORPORATION TO BE RELIABLE. NO WARRANTY CAN BE MADE THAT CIRCUMSTANCES HAVE NOT CHANGED SINCE THE DATE SUCH INFORMATION WAS SUPPLIED. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF DOCUMENTS RELATING TO THE CORPORATION AND THE PURCHASE OF THE SHARES, AS WELL AS SUMMARIES OF VARIOUS PROVISIONS OF RELEVANT STATUTES AND REGULATIONS. SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF THE ORIGINAL DOCUMENTS, STATUTES AND REGULATIONS, WHICH ARE INCLUDED HEREWITH OR AVAILABLE UPON REQUEST.

THIS OFFERING MAY NOT BE CONDUCTED PURSUANT TO ANY GENERAL SOLICITATION OR ADVERTISING.

THE STATEMENTS CONTAINED HEREIN ARE BASED ON INFORMATION BELIEVED BY THE CORPORATION TO BE RELIABLE. NO WARRANTY CAN BE MADE THAT CIRCUMSTANCES HAVE NOT CHANGED SINCE THE DATE SUCH INFORMATION WAS SUPPLIED. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF DOCUMENTS RELATING TO THE CORPORATION AND THE PURCHASE OF THE SHARES, AS WELL AS SUMMARIES OF VARIOUS PROVISIONS OF RELEVANT STATUTES AND REGULATIONS. SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXTS OF THE ORIGINAL DOCUMENTS, STATUTES AND REGULATIONS, WHICH ARE INCLUDED HEREWITH OR AVAILABLE UPON REQUEST.

NO PERSON ACTING IN ANY CAPACITY WHATSOEVER HAS BEEN AUTHORIZED BY THE CORPORATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND THE EXHIBITS HERETO IN CONNECTION WITH THE OFFERING DESCRIBED HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE CORPORATION. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION CONTAINED HEREIN SINCE THE RESPECTIVE DATES ON WHICH THIS INFORMATION IS GIVEN OR THE DATE HEREOF. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS NOT CONTAINED IN THIS MEMORANDUM OR IN THE EXHIBITS HERETO, AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, TO ANY PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM IS DELIVERED, WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGEMENT OF THE CORPORATION, IS PROHIBITED.

Exhibit _____ Page _9_

**NASAA UNIFORM LEGEND**

IN MAKING AN INVESTMENT DECISION, YOU SHOULD MAKE YOUR OWN DECISION WHETHER THIS OFFERING MEETS YOUR INVESTMENT OBJECTIVES AND RISK TOLLERANCE LEVEL. IN ADDITION, YOU MUST RELY UPON YOUR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED, DISAPPROVED, ENDORSED, OR RECOMMENDED THIS OFFERING. NO INDEPENDENT PERSON HAS CONFIRMED THE ACCURACY OR TRUTHFULENESS OF THIS DISCLOSURE, NOR WHETHER IT IS COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD, EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**SPECIAL NOTICE TO ALL INVESTORS**

EACH INVESTOR IS HEREBY GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM, THE OFFICERS AND DIRECTORS OF THE CORPORATION OR ANY PERSON ACTING ON ITS BEHALF, CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION TO THE EXTENT THE CORPORATION POSSESSES SUCH INFORMATION (OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT AND EXPENSE) NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. FURTHERMORE, THE CORPORATION HAS, OR WILL HAVE, VARIOUS DOCUMENTS CONNECTED WITH THE PROPOSED BUSINESS OF THE CORPORATION. ALL SUCH DOCUMENTS ARE AVAILABLE TO ANY PROSPECTIVE INVESTOR. IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM PLEASE WRITE OR CALL THE CORPORATION, AT THE ADDRESS AND TELEPHONE NUMBER LISTED BELOW.

IN VIEW OF THE FOREGOING AND OTHER MATTERS SET FORTH IN THIS MEMORANDUM, INVESTMENT IN THE SHARES SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD TO ASSUME A HIGH DEGREE OF RISK, INCLUDING TOTAL LOSS OF THEIR INVESTMENT.

**Availability of Additional Information**

THE PRESIDENT AND OTHER OFFICERS AND DIRECTORS OF THE CORPORATION WILL BE AVAILABLE TO EACH PROSPECTIVE PURCHASER OF THE SHARES DURING NORMAL BUSINESS HOURS AND WILL RESPOND TO QUESTIONS CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING. THESE PERSONS ALSO WILL PROVIDE TO PROSPECTIVE PURCHASERS ANY ADDITIONAL INFORMATION THAT IS AVAILABLE TO THE CORPORATION OR WHICH CAN BE OBTAINED BY THE CORPORATION WITHOUT UNREASONABLE EFFORT OR EXPENSE THAT IS NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION FURNISHED IN THIS MEMORANDUM. PERSONS WISHING TO AVAIL THEMSELVES OF THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS OR TO OTHERWISE OBTAIN INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION FURNISHED IN THIS MEMORANDUM SHOULD DIRECT THEIR INQUIRIES TO: EAGLE DEVELOPMENT ENTERPRISES, INC., 2125 EAST KATELLA AVENUE, SUITE 350, ANAHIEM, CALIFORNIA 92806, TELEPHONE NUMBER (800) 394-9868.

Exhibit _____1_____ Page___10___

# TABLE OF CONTENTS

INVESTOR NOTICES ........................................................................................ iii

I.      SUMMARY OF OFFERING ................................................................. 1

II.     WHO SHOULD INVEST – INVESTOR SUITABILITY STANDARDS ............... 7

III.    RISK FACTORS................................................................................... 11

IV.    SOURCES AND USE OF PROCEEDS OF THE OFFERING. ......................... 15

V.     PROPOSED OPERATIONS OF THE CORPORATION................................... 17

VI.    MANAGEMENT ................................................................................ 25

VII.   DESCRIPTION OF SECURITIES. ......................................................... 27

VIII.  TERMS OF THE OFFERING ............................................................... 29

IX.    SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES........................ 31

X.     ERISA CONSIDERATIONS.................................................................. 34

XI.    CERTAIN TRANSACTIONS AND CONFLICTS OF INTEREST...................... 36

XII.   REPORTS TO SHAREHOLDERS .......................................................... 37

XIII.  SALES LITERATURE ........................................................................ 37

XIV.  ACCESS TO INFORMATION................................................................ 37

XIV.  APPENDICES

      A.   Financial Information ............................................................... A-1

      B.   Subscription Agreement, Confidential Purchaser Questionnaire
          and Purchaser Representative Questionnaire..................................... C-1

      C.   IRA Subscription Documents ...................................................... D-1

Exhibit _____ Page _____

**[INTENTIONALLY LEFT BLANK]**

Exhibit ____1____ Page____12____

# SUMMARY OF THE OFFERING

THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY, AND SHOULD BE READ IN CONJUNCTION WITH, THE DETAILED INFORMATION APPEARING ELSEWHERE IN THIS MEMORANDUM WITH RESPECT TO THE MATTERS SUMMARIZED HEREIN AS WELL AS OTHER MATTERS NOT COVERED BY THIS SUMMARY. THIS MEMORANDUM CONTAINS, IN ADDITION TO HISTORICAL INFORMATION, FORWARD-LOOKING STATEMENTS THAT INVOLVE RISKS AND UNCERTAINTIES. THE CORPORATION'S ACTUAL RESULTS OR EXPERIENCE COULD DIFFER SIGNIFICANTLY FROM THOSE DISCUSSED IN THE FORWARD-LOOKING STATEMENTS. FACTORS THAT COULD CAUSE OR CONTRIBUTE TO SUCH DIFFERENCES INCLUDE, BUT ARE NOT LIMITED TO, THOSE DISCUSSED IN "RISK FACTORS' AS WELL AS THOSE DISCUSSED ELSEWHERE IN THIS MEMORANDUM. ALL PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW THE ENTIRE CONTENTS OF THIS MEMORANDUM AND THE EXHIBITS ATTACHED HERETO, INDIVIDUALLY AND WITH THEIR OWN TAX AND FINANCIAL ADVISORS.

Eagle Development Enterprises, Inc., a Nevada corporation (the "Corporation") formed on March 26, 2007, hereby offers (the "Offering") a maximum of 25,000,000 shares of common stock ("Shares" or "Common Stock") of the Corporation at a purchase price per Share of $1.00. The minimum investment is Fifty Thousand Dollars ($50,000) for the purchase of fifty thousand (50,000) Shares, except as otherwise provided herein. The Corporation has elected to be taxed as a Real Estate Investment Trust ("REIT") as a consequence of which the Corporation will be entitled to certain tax benefits accruing to REITs generally. (See "Summary of Income Tax Consequences.") The Corporation has been organized for the purposes of (1) organizing, capitalizing, acquiring, and managing real estate entities engaged in various aspects of real estate, including, when and if opportunities arise, (i) development of new residential housing projects including development in Kingman, Arizona through the Corporation's wholly owned subsidiary Eagle Housing & Development AZ, LLC ("Eagle Housing AZ") (ii) development of residential rental real estate properties, (iii) development of assisted living facilities including board and care residential facilities, (iv) development of light industrial real estate properties, (v) development of residential apartment housing, (vi) development of public storage facilities, (vii) acquisition of developed and undeveloped real property in foreclosure, trust deed auctions, sales of bank owned real estate ("REO"), probate sales and private sales, and rehabilitation and sales of the properties ("Rehabilitation Development") and (viii) possible acquisition of membership interests of Eagle Assets and Management, LLC, a California limited liability company engaged in business of Rehabilitation Development ("Eagle Assets"), and/or Eagle Storage & Development, LLC, an Arizona limited liability company engaged in the business of owning and operating a storage facility in Lake Havasu City, Arizona ("Eagle Storage"); (2) engaging in a reorganization pursuant to which (a) the Corporation will become a subsidiary of a public liability company ("PLC") to be organized in the UK, upon which reorganization each shareholder of the Corporation will receive one thousand (1,000) shares of common stock of the PLC and ten (10) Shares of the Corporation in exchange for 1000 Shares of Common Stock of the Corporation (the "Reorganization"), and (b) provided the shareholders of the Corporation and a majority in interest of the Members of Eagle Assets and/or Eagle Storage approve of the reorganization, issue shares of stock of the Corporation and PLC to such Members in exchange for their Membership Interests in the those entities, as a consequence of which Eagle Assets and/or Eagle Storage will become subsidiaries of the Corporation. Michael J. Bowen is the President and Chief Executive Officer of the Corporation. (See "Management")

The purchase of Shares is suitable only for sophisticated investors who can appreciate and understand the risks involved, who have the financial means to bear such risks, who have no need for liquidity from this investment, and who meet certain minimum objective financial criteria. (See "Who should Invest-Investor Suitability Standards.")

The Shares are being offered by the Corporation, its agents, and possibly broker-dealers. The Offering will terminate at the earlier of (i) July 31, 2008 or (ii) when all Shares being offered are sold (the "Offering Termination Date"); provided, however, that the Board of Directors of the Corporation (the "Directors"), in the Director's sole and absolute discretion, may (a) extend the Offering Termination Date to a date no later than December 31, 2008 or (b) terminate the Offering at any time. (See "Terms of the Offering.") The sale price of the Shares has been arbitrarily determined by the Corporation and does not necessarily bear any relationship to the Corporation's book value, assets, past operating results, financial condition, generally accepted accounting principles or any other established criteria for establishing value. (See "Terms of the Offering," "Risk Factors" and "Description of Securities")

| | Price to Public | Fees, Commissions and Allowances[2] | Proceeds to the Corporation [1] |
|---|---|---|---|
| Per Share | $ 1.00[1] | 20% | $ 0.80 |
| Minimum Purchase | $ 50,000.00[1] | 20% | $ 40,000.00 |
| Total Offering -- Maximum | $ 25,000,000.00[1] | 20% | $ 20,000,000.00 |

(1) The Offering price per share is $1.00, with a minimum investment of Fifty Thousand Dollars ($50,000) for the purchase of fifty thousand (50,000) Shares); provided, however, the President may accept subscriptions for fewer than 50,000 Shares ($50,000) in his sole and absolute discretion.

Exhibit ___1___ Page__13__

(2)            The Corporation may pay commissions, fees and non-accountable expenses in an amount up to 20% of the proceeds of any Shares sold by certain other broker-dealers who are Shareholders of the National Association of Securities Dealers, Inc. ("NASD") who serve as placement agents on behalf of the Corporation, payable (i) up to 15% as commissions, (ii) up to 3% as non-accountable expenses for serving as the placement agent on behalf of the Corporation, and (iii) up to 2% for due diligence expenses.  In addition, the Corporation may agree to indemnify participating broker-dealers against certain liabilities under the Securities Act of 1933, as amended.  Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% of the proceeds to certain individuals who introduce investors to the Corporation.  As a result, the amount of proceeds to the Corporation will vary depending upon the status of the person selling the Shares.  The Corporation will not pay any commissions, finders' fees or other amounts to the President or any other Officer or Director of the Corporation.  (See "Terms of the Offering – Plan of Distribution.")

(3)            Before deducting legal, accounting, printing and miscellaneous expenses, which are estimated to be approximately $300,000.

**[INTENTIONALLY LEFT BLANK]**

Exhibit _____ Page __14__

# TERMS OF THE OFFERING

**Securities Offered:** ...............

This Offering is comprised of a maximum of 25,000,000 Shares of the securities of Eagle Development Enterprises, Inc., a Nevada corporation (the "Corporation"). The Shares being offered hereby have such rights as defined elsewhere in this Memorandum. (See "Description of Securities.")

**Price:** ............................

$1.00 per Share.

**Size of Offering:** .................

A maximum of 25,000,000 Shares for a total maximum offering of $25,000,000 (the "Total Offering"). (See "Description of Securities.")

**Minimum Investment:** .........

Minimum purchase of fifty thousand (50,000) Shares with a minimum purchase price of Fifty Thousand Dollars ($50,000) except as provided in this Memorandum.

**Shares of the Corporation:** ..........

The Corporation is authorized to issue a total of five hundred million (500,000,000) Shares of Common Stock. Prior to, and effective on the date of this Offering, the Corporation has issued (a) twenty-five million (25,000,000) Shares of Common Stock to Michael J. Bowen, the President and CEO of the Corporation and ten million (10,000,000) Shares to Jose ("Joe") Maldonado, the Vice President of the Corporation, in consideration for which Messrs. Bowen and Maldonado have contributed to the Corporation (i) all of their right, title and interest in and to Eagle Housing & Development AZ, LLC ("Eagle Housing AZ"), an Arizona limited liability Corporation organized to develop approximately 270 single family residential homes in Kingman, Arizona and (ii) other valuable assets in connection with the organization of the Corporation and (b) thirty million fifty thousand (30,050,000) Shares to third party investors at a purchase price of twenty cents ($0.20) per Share to provide bridge financing for the Corporation. Subsequent to this Offering, and assuming the total Offering of 25,000,000 Shares of Common Stock is subscribed for, there will be a total of approximately 90,050,000 shares of Common Stock issued and outstanding that will represent 100% of the ownership of the Corporation with voting power in proportion to the number of Shares held. In addition, assuming the Reorganization is consummated and all of the Shareholders of Eagle Assets and Eagle Storage elect to exchange their Membership Interests in the respective Eagle Entities for Shares of Common Stock of the Corporation, there will be approximately 130,000,000 Shares of Common Stock of the Corporation issued and outstanding.

The purchase price for the Shares is payable in cash upon subscription. (See "Summary of the Operating Agreement – Distributions" and "Appendix C-1.")

**Acceptance of Subscriptions:** ..................

No sales will be made or commitments to purchase accepted from a natural person (including any corporation, partnership or other legal entity specifically formed by a natural person for the purpose of acquiring the Shares) until five (5) business days after delivery of the Memorandum to such person.

**Investor Suitability:** .............

The Corporation will accept subscriptions solely from investors who qualify as "Accredited Investors" under Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"). The Shares will be offered only to Accredited Investors who come within the parameters of the restrictions imposed upon limited offerings in the various states in which the securities are being sold and who fall within Section 4(2) of the Securities Act, and Rule 506 of Regulation D promulgated thereunder, for purposes of the federal requirements. As defined in Regulation D of the Securities Act, Accredited Investors will generally include individuals with a net worth in excess of $1,000,000 or annual income in excess of $200,000. In addition, an investor must either (i) have a pre-existing business or personal relationship with the Officers or Directors of the Corporation, or (ii) have sufficient business and financial experience to be able to properly evaluate the merits and risks of an investment in the Shares, or have a professional financial advisor who can assist in such evaluation. No offer or sale to any person not meeting the investor suitability standards described above and in more detail elsewhere in this Memorandum is authorized by the Corporation, and all investors will be required to make certain representations to the Corporation regarding their status as qualified investors (See "Who Should Invest – Investment Suitability Standards" and "Terms of the Offering.")

Exhibit _____1_____ Page 15

**Restrictions on Transfer:** ......

The Shares offered and sold pursuant to this Offering Memorandum are not being registered under the Securities Act of 1933, as amended (the "Securities Act") or under the "blue sky" securities laws of any state and are being offered and sold in reliance upon exemptions from such registration requirements under the Securities Act and applicable state securities laws, and, therefore, will be "restricted securities" as such term is defined in Rule 144 promulgated under the Securities Act. The Shares are not transferable. No investor is entitled to assign, convey, sell, encumber or in any way alienate all or part of his or her Shares, except according to pertinent Federal and State restricted securities laws. Currently, there is no market for the Shares and there is no guarantee that one will develop. Therefore, investors must be prepared to bear the risk of their investment for an indefinite period of time. There can be no guarantee that a registration and/or public offering of the Shares will ever occur. Notwithstanding the foregoing, upon the consummation of the Reorganization, shares of Eagle PLC Common Stock issues to the Shareholders of the Corporation will be freely transferable and, upon listing on the Plus Market, will be transferable through each market maker that the Corporation engages to make a market in the Eagle PLC Shares. (See "Risk Factors" and "Description of Securities")

**Risk Factors:** ......................

An investment in these Shares offered hereby involves a high degree of risk and possible loss of the entire investment. Prospective purchasers should carefully review the information set forth under "Risk Factors" as well as other information contained in this Memorandum. (See "Risk Factors")

**Use of Proceeds:** .................

The proceeds from the sale of Shares offered hereby, net of commissions and other expenses of the Offering, will be used (i) to organize Eagle PLC, complete the Reorganization, engage one or more market makers in the UK and register the Eagle PLC Shares on the Plus Market, Alternate Investment Market ("AIM") or other public stock market in the UK, (ii) develop the single family residential homes through Eagle Housing AZ, the wholly-owned subsidiary of the Corporation, (iii) invest in, develop and/or acquire additional real estate projects such as (a) assisted living facilities including board and care facilities, (b) development of new residential housing properties, (c) light industrial real estate properties, (d) residential rental properties, (e) public storage facilities, (f) Rehabilitation Development, (g) acquisition of membership interests of Eagle Assets & Eagle Storage and (h) provided the Shareholders of Eagle Assets and Eagle Storage agree to participate in the Reorganization, ownership and management of the Eagle Assets and Eagle Storage properties. Pending use of the Offering proceeds as described above and in more detail elsewhere in this Memorandum, the Corporation may make temporary investments in United States government obligations, short-term bank certificates of deposit, commercial paper or money market funds. (See "Sources and Use of Proceeds of the Offering" and "Risk Factors")

**Commissions and Fees:** .......

The Corporation will pay to participating broker-dealers, who are Shareholders of the NASD, (i) selling commissions in the amount of up to 15%, (ii) due diligence fees in the amount of up to 2%, and (iii) non-accountable expenses in the amount of up to 3% of all Shares placed. In addition, the Corporation may agree to indemnify participating broker-dealers against certain liabilities under the Securities Act. Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% and office expenses of up to 5% of the proceeds to certain individuals who introduce investors to the Corporation. As a result, the amount of selling fees related to the sale of the Shares will vary depending upon the method employed to sell any of the Shares. Accordingly, the Corporation may pay fees and/or incur expenses in an amount equal to a maximum of 20% of any Share sold. The Corporation will not pay any commission, finders' fees or other amounts to the President or any Officer of the Corporation. (See "Terms of the Offering – Plan of Distribution.")

**Capitalization:** .................

As of the date of this Memorandum, (a) Michael J. Bowen, the President and CEO of the Corporation, and Jose ("Joe") Maldonado, the Vice President of the Corporation, have contributed all of this issued and outstanding membership interests in Eagle Housing & Development AZ, LLC and other valuable assets to the Corporation in consideration for which the Corporation has issued twenty-five million (25,000,000) Shares of Common Stock to Mr. Bowen and ten million (10,000,000) Shares to Mr. Maldonado and (b) the Corporation has issued thirty-two million five hundred thousand (30,050,000) Shares to investors at a selling price of Twenty Cents ($0.20) per Share to provide bridge financing on behalf of the Corporation. The Shareholders, including Mr. Bowen to the extent he subsequently purchases Shares pursuant to this Offering, shall purchase a maximum of 25,000,000 Shares at a purchase price per Share of $1.00 for a total of a maximum capitalization of $25,000,000. As noted hereinabove, Michael J. Bowen, the President

Exhibit ____1____ Page __16__

and Chief Executive Officer of the Corporation, and Jose "Joe Maldonado have contributed to the Corporation (i) all of their right, title and interest in and to Eagle Housing AZ, an Arizona limited liability Corporation organized to develop approximately 270 single family residential homes in Kingman, Arizona and (ii) other valuable assets in connection with the organization of the Corporation. Based upon the foregoing, following is the maximum contribution to the capital of the Corporation: (i) contributions to the Corporation by the Shareholders for the purchase of the Shares offered pursuant to this Memorandum (a maximum of $25,000,000, (ii) capitalization in the amount of $6,010,000 in connection with the bridge financing and (iii) contributions by Mr. Bowen of the Membership Interests of Eagle Housing AZ and, (iv) assuming agreement by all of the Shareholders of Eagle Assets and Eagle Storage to participate in the Reorganization, acquisition of all of the Membership Interests of the Eagle Assets and Eagle Storage with an aggregate fair market value, in the opinion of management, of approximately $16,000,000 net of liabilities. The Officers and Directors of the Corporation may, in their sole and absolute discretion, accept subscriptions for fewer than the maximum number of Shares offered pursuant to this Offering if the balance thereof is not needed for the real estate investment, acquisition and development.

**Dividend:**...........................

The Corporation intends to elect to be treated as a REIT for Federal Income Tax purpose. The Internal Revenue Code (the "Code") and Regulations promulgated thereunder, a REIT is required to distribute ninety five percent (95%) of its net profits as dividends to its Shareholders. As a consequence, net profits derived from the real estate operation of the Corporation, will be allocated and distributed to the Shareholders as Dividends. All Dividend distributions will be allocated and distributed to the Shareholders in accordance with the number of Shares held. (See "Tax Aspects")

**The Subscription
Agreement:** .....................

The purchase of the Shares will be made pursuant to a Subscription Agreement and Confidential Purchaser Questionnaire that contains, among other things, customary representations and warranties by the Corporation, certain covenants of the Corporation, investment suitability representations of the purchasers, including representations that may be required by the Securities Act and applicable state "blue sky" laws, and appropriate conditions to closing, including, but not limited to, qualification of the offer and sale of the Shares under applicable state "blue sky" laws. A booklet containing a Subscription Agreement, Confidential Purchaser Questionnaire, and Purchaser Representative Questionnaire are being delivered together with this Memorandum. All information provided by a prospective purchaser will be held in confidence by the Corporation and will not be shared with any person or other Corporation whatsoever.

**Offering Period:** ..................

This Offering will terminate upon the earlier of: (i) acceptance by the Corporation of Subscriptions for the entire number of Shares offered hereby and receipt of the proceeds therefrom or (ii) July 31, 2008 (the "Offering Termination Date"); provided, however, that the Board of Directors of the Corporation (the "Directors"), in the Director's sole and absolute discretion, may (a) extend the Offering Termination Date to a date no later than December 31, 2008 or (b) terminate the Offering at any time. (See "Terms of the Offering".)

**Forward-Looking
Statements:** ......................

This Memorandum contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act") and the Corporation intends that such forward-looking statements be subject to the safe harbors for such statements under such sections. The Corporation's forward-looking statements include the plans and objectives of Management for future operations, including plans and objectives relating to the Corporation's business and, in turn, the Corporation's future economic performance. The forward-looking statements and associated risks set forth in this Memorandum include or relate to: (i) the ability of the Corporation to acquire additional Properties on advantageous terms, if at all, (ii) the ability of the Corporation to rehabilitate and/or develop the Properties within reasonable cost restraints, and (iii) the ability of the Corporation to sell the Properties at a profit. (See "Risk Factors – Forward-Looking Statements".)

**Exhibit ____1____ Page__17__**

*Available Information*

The Corporation is not presently subject to the information reporting requirements of the Exchange Act, and therefore does not file reports, proxy statements and other statements and information with the Securities and Exchange Commission (the "SEC"). Subsequent to this Offering, the Corporation may seek to become subject to such requirements and upon approval by the SEC, will begin forwarding such reports to investors upon request. There can be no assurance that the Corporation will be successful in seeking reporting status. In addition, pursuant to the requirements of the Corporation's Operating Agreement, the Corporation is required to provide certain information to its Shareholders.

The Corporation's offices are located at 2125 East Katella Avenue, Suite 350, Anaheim, California 92806. The telephone number of the Corporation is (800) 394-9868. Prospective investors are invited to make such inquiries of the Officers and Directors of the Corporation as they deem necessary to fully apprise themselves of all of the material facts about the Corporation and of this Offering.

[INTENTIONALLY LEFT BLANK]

Exhibit _____1_____ Page___18_____

# WHO SHOULD INVEST – INVESTOR SUITABILITY STANDARDS

## General

Investment in the Shares involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment. See "Risk Factors". The Shares will be sold to investors who are or whom the Corporation reasonably believes are "accredited investors", as that term is defined below.

The suitability standards discussed below represent minimum suitability standards for prospective investors. The satisfaction of such standards by a prospective investor does not necessarily mean that the Shares are a suitable investment for such prospective investor. Prospective investors are encouraged to consult their personal financial advisors to determine whether an investment in the Shares is appropriate. The Corporation may reject subscriptions, in whole or in part, in its absolute discretion.

Prospective investors must carefully review and understand the risks of, and other considerations relating to, an investment in the Corporation. Accordingly, the suitability for any particular investor will depend upon, among other things, the investor's investment objectives and the investor's ability to accept the risks of a highly speculative investment.

The Corporation will require each investor to represent in writing, among other things, that (a) such investor either (i) has a pre-existing business or personal relationship with Michael J. Bowen, the President of the Corporation, which business or personal contacts are of a nature and duration such as would enable a reasonably prudent investor to be aware of the character, business acumen and general business and financial circumstances of the person(s) with whom such relationship exists, or (ii) has such knowledge and experience in financial and business matters, or has obtained professional financial advice from a qualified advisor ("Purchaser Representative"), to enable the investor to evaluate the merits and risks of an investment in the Shares sufficient to make an informed investment decision with respect thereto, and of protecting his or her own interest in connection with the transaction; (b) the investor is acquiring the Shares for his or her own account, for investment only and not with a view toward the resale or distribution thereof; (c) the investor is aware that the Shares have not been registered under the Securities Act, or any state securities laws, and that transfer thereof is restricted by applicable state securities laws and the Subscription Agreement to be entered into in connection with the purchase of the Shares, and (d) such investor meets the suitability standards set forth in this Memorandum.

In addition, each prospective investor must represent that (i) such investor (a) is capable of bearing the possible loss of his or her entire investment in the Shares, (b) can afford to bear the economic risks of his or her investment for an indefinite period, and (c) do not have a need for a high degree of liquidity in this investment; (ii) such investor has read this Memorandum and the related Exhibits, and in making his or her decision to purchase the Shares, all matters relating to this Memorandum and its Exhibits have been discussed and explained to him or her to his or her satisfaction and he or she understands the highly speculative nature of, and the risks involved in, the proposed investment; (iii) such investor is acquiring the Shares purchased by him or her without relying on any sales literature or information other than this Memorandum and the Exhibits hereto; and (iv) such investor recognizes that the purchase of the Shares involves certain risks, including, but not limited to, those set forth under the caption "Risk Factors" of this Memorandum.

Prospective investors must carefully review and understand the risks of, and other considerations relating to, an investment in the Corporation. Accordingly, the suitability for any particular investor will depend upon, among other things, the investor's investment objectives and the investor's ability to accept the risks of a highly speculative investment.

This Offering is made and the Corporation will sell Shares solely to investors either (i) qualifying as "Accredited Investors" under Rule 501(a) of Regulation D promulgated under the Securities Act or (ii) with a prior relationship to the President of the Corporation.

    **1.**    **Accredited Investors.** The term "Accredited Investor" refers to any person or entity that represents to the Corporation they are included within any of the following categories at the time of the sale of the Shares to such investor:

    (a)    Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000;

    (b)    Any natural person who had an individual income in excess of $200,000 in each of the two (2) most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

    (c)    Any director or executive officer of the issuer of the securities being offered or sold, or any director or executive officer of that issuer;

    (d)    Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

Exhibit _____1_____ Page _19_

(e)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares offered, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the prospective investment; and

(f)     Any bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); an insurance Corporation as defined in Section 2(13) of the Securities Act; an investment Corporation registered under the Investment Corporation Act of 1940 or a business development Corporation as defined in Section 2 (a) (48) of that act; a Small Business Investment Corporation licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of that act, which is either a bank, savings and loan association, insurance Corporation, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(g)     Any private business development Corporation as defined in section 202(a)(22) of the Investment Advisors Act of 1940; and

(h)     Any entity in which all of the equity owners are accredited investors under subdivisions (a)-(g) of this paragraph.

## Use of a Purchaser Representative

Prior to purchase, any offeree who does not have the requisite knowledge or experience to be capable of evaluating the merits and risks of an investment in the Shares will be required to represent that he or she has relied upon a "Purchaser Representative."

The Corporation will evaluate the qualifications of each proposed Purchaser Representative and will notify the prospective investors if such person is acceptable as a Purchaser Representative. In order for a person to qualify as a Purchaser Representative, the Corporation must believe, and have reasonable grounds to believe, that such person satisfies all of the following criteria: (a) such person is not an affiliate, officer, director or other employee of the Corporation, or beneficial owner of ten percent (10%) or more of any class of the equity securities or ten percent (10%) or more of the equity interest in the Corporation (unless the offeree is also: (i) related to the Purchaser Representative by blood, marriage or adoption no more remote than as first cousin; (ii) a trust or estate in which the Purchaser Representative and any person related to him or her, as specified in subdivision (a)(i) or (a)(iii) of this paragraph, collectively have more than fifty percent (50%) of the beneficial interest (excluding contingent interests) or of which the Purchaser Representative serves as trustee, executor or in any similar capacity; or (iii) a corporation or other organization of which the Purchaser Representative and any person related to him or her as specified in subdivision (a) (i) of this paragraph, collectively, are the beneficial owners of more than fifty percent (50%) of the equity securities or equity interest; (b) such person has such knowledge and experience in financial and business matters that he or she, either alone or together with other Purchaser Representatives of the offeree, is capable of evaluating the merits and risks of the prospective investment; (c) such person is acknowledged by the investor, in writing, during the course of the transaction, to be his or her Purchaser Representative in connection with evaluating the merits and risks of the prospective investment in the Corporation; and (d) such person discloses to the offeree, in writing, prior to the acknowledgement specified in subdivision (c) of this paragraph and the sale of the Shares offered hereby, any material relationship between such person or his or her affiliates and the Corporation or its affiliates, which then exists or is mutually understood to be contemplated or which has existed at any time during the previous two (2) years, and any compensation received or to be received as a result of such relationship.

Because the above is a general description of a Purchaser Representative, the Corporation must independently determine in each instance whether or not a Purchaser Representative does in fact qualify as such and meets the applicable requirements contained in a Purchaser Representative Questionnaire, which is attached to the Appendix C to this Memorandum. Accordingly, each prospective investor proposing to use a Purchaser Representative must have such Purchaser Representative provide to the Corporation a completed and executed Purchaser Representative Questionnaire.

## Investment Intent; Ability to Accept Limitations on Transferability

Each investor will be required to represent that: (i) he or she is acquiring the Shares for his or her own account, for investment only and not for resale, distribution or on behalf of an undisclosed principal; (ii) he or she is aware that the transfer of the Shares purchased through this offering is restricted by federal and state securities laws and that a public market does not exist for the Shares; (iii) no transfer of the Shares will take place unless, in the opinion of counsel for the Corporation, such transfer is exempt from registration under the Securities Act, the Exchange Act and applicable state securities laws.

To assure compliance with this requirement, the Corporation will, at a minimum, take the following actions: (i) place a legend on any certificate evidencing ownership of the Shares in the Corporation stating that such Shares have not been registered under the Securities Act, the Exchange Act or any state securities laws and setting forth or referring to the restrictions on transferability and sale of the Shares; (ii) provide a copy of California Commissioner of Corporations Rule 260.141.11 to any investor who is a

Exhibit ____1____ Page __20__

resident of California or who invests in the Corporation while situated in that state; (iii) make a notation on the appropriate records of the Corporation reflecting on such restrictions; and (iv) obtain from the purchaser a signed written agreement that the Shares will not be sold without registration under the Securities Act and state securities laws or exemptions therefrom.

**Confidential Purchaser Questionnaire/Subscription Agreement**

To assist the Corporation in evaluating whether a prospective investor is a qualified purchaser and otherwise satisfies the above-referenced investor suitability standards, each prospective investor who intends to invest in the Shares must complete a Subscription Agreement and Confidential Purchaser Questionnaire in the form attached as Appendix "C-1" to this Memorandum. In addition, such prospective investor will also be required to provide whatever additional evidence is deemed necessary to substantiate information or representations made in the subscription documents.

If the Corporation, in its sole and absolute discretion, believes the prospective investor is not a qualified purchaser or does not possess the requisite knowledge and experience in financial and business matters to protect his or her interests, the President may require such prospective investor to engage a qualified Purchaser Representative meeting the requirements set forth above, to assist the prospective investor in evaluating the merits and risks of an investment in the Shares. Moreover, the above suitability standards represent minimum suitability requirements for investors. Accordingly, the satisfaction of applicable requirements by a prospective investor will not necessarily mean that the Shares are a suitable investment for such prospective investor.

The suitability standards referred to above represent minimum suitability requirements for prospective investors, and the Corporation reserves the right, in its sole and absolute discretion, to determine whether the purchase of the Shares is a suitable investment for any particular investor, regardless of whether such prospective investor meets the minimum suitability standards described in this Memorandum. The Corporation, in circumstances it deems appropriate, may modify such requirements. The Corporation retains the right, in its sole and absolute discretion and at any time, to determine whether the purchase of the Shares is a suitable investment for any particular investor, regardless of whether such prospective investor meets the minimum suitability standards described in this Memorandum. Accordingly, the Corporation may refuse any subscriptions for purchase of the Shares, by written notice of such rejection accompanied by the return of any funds deposited by such prospective investor, without interest thereon, and without reduction for any costs or expenses.

This Memorandum shall not constitute an offer to sell or solicitation of an offer to purchase Shares until the Corporation has determined from completed questionnaires or otherwise that the prospective investor and his or her Purchaser Representative(s), if any, meet the above criteria.

If any representation made by an offeree or other person acting on his or her behalf misleads the Corporation as to the financial or other circumstances of a particular offeree, or if, because of any error or misunderstanding as to such circumstances, a copy of this Memorandum is delivered to such offeree, the delivery of such copy of the Memorandum shall not be deemed to be an offer, and such Memorandum shall be immediately returned to the Corporation.

**THE FOREGOING SUITABILITY STANDARDS REPRESENT MINIMUM REQUIREMENTS, AND NEITHER THE SATISFACTION OF SUCH STANDARDS BY A PROSPECTIVE INVESTOR NOR THE ACCEPTANCE BY THE CORPORATION OF A PROSPECTIVE INVESTOR'S SUBSCRIPTION NECESSARILY MEANS THAT THE SHARES ARE A SUITABLE INVESTMENT FOR SUCH INVESTOR. THE FINAL DETERMINATION AS TO SUITABILITY OF AN INVESTMENT IN THE CORPORATION CAN ONLY BE MADE BY A PROSPECTIVE INVESTOR AND HIS OR HER ADVISORS. THE CORPORATION RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. EACH SUBSCRIPTION SHALL BE ACCEPTED OR REJECTED BY THE CORPORATION IN WRITING WITHIN THIRTY (30) DAYS FOLLOWING RECEIPT OF A PROSPECTIVE INVESTOR'S COMPLETED SUBSCRIPTION AGREEMENT, CONFIDENTIAL PURCHASER QUESTIONNAIRE (AND, IF APPROPRIATE, PURCHASER REPRESENTATIVE QUESTIONNAIRE) AND SUBSCRIPTION FUNDS. IF REJECTED, ANY FUNDS ORIGINALLY DELIVERED BY THE PROSPECTIVE INVESTOR WILL BE PROMPTLY RETURNED, WITHOUT INTEREST THEREON. WHEN SUCH FUNDS HAVE BEEN RETURNED, THE CORPORATION AND SUCH PROSPECTIVE INVESTOR SHALL HAVE NO FURTHER OBLIGATION ONE TO THE OTHER.**

Should the securities laws of any state require that a prospective investor meet suitability standards more restrictive than the foregoing standards, this Memorandum shall not constitute an offer to sell Shares unless and until the Corporation provides a supplement to this Memorandum setting forth such more restricted suitability standards, and such prospective investor represents in an amended Purchaser Questionnaire that he or she meets the more restrictive standards.

Exhibit ___1___ Page ___21___

[INTENTIONALLY LEFT BLANK]

# RISK FACTORS

THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. AN INVESTMENT SHOULD ONLY BE CONSIDERED BY PERSONS WHO HAVE A CONTINUING HIGH LEVEL OF ANNUAL INCOME AND WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT IN THE CORPORATION AND HAVE NO NEED FOR A RETURN ON THEIR INVESTMENT. PRIOR TO MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER, ALONG WITH ALL OF THE INFORMATION CONTAINED IN THIS MEMORANDUM, THE FOLLOWING RISK FACTORS ATTENDANT UPON THAT INVESTMENT, AND SHOULD CONSULT WITH THEIR OWN LEGAL AND FINANCIAL ADVISORS WITH RESPECT THERETO:

1.      The capital anticipated to be required by the Corporation for the development of various real estate projects and Reorganization is being sought solely from the proceeds of this Offering. Therefore, the investors will bear all of the financial risk of the Corporation's successful implementation of its proposed business plan. Michael J. Bowen, the President and CEO of the Corporation, and Jose ("Joe") Maldonado, have contributed all of their right, title and interest in and to the Membership Interests issued by Eagle Housing AZ, representing 100% of the issued and outstanding Membership interests therein, together with the Corporation as existing as of the date of this Memorandum, in consideration for which Mr. Bowen has received twenty-five million (25,000,000) and Jose ("Joe") Maldonado has received ten million (10,000,000) Shares of Common Stock of the Corporation. In addition, provided the Shareholders of the Eagle Entities approve of the plan of Reorganization, Mr. Bowen will exchange his membership interests in each of the respective Eagle Entities for Shares of Common Stock of the Corporation, increasing his personal exposure to and risk of such loss. Accordingly, if the Corporation experiences operating losses, or a loss on investment in its real estate operations, Mr. Bowen will bear a share of any loss.

2.      **Adequacy of Capital; Dependence on Additional Capital for Future Growth.** Management of the Corporation believes that the (i) maximum proceeds from this Offering and a subsequent offering of 25,000,000 Shares at a price of $1.00 per Share, after deducting (1) commissions and other fees payable to certain broker-dealers, (2) the expenses of the Offering $300,000, and (3) overhead expenses incurred for managing the business of the Corporation, together with (ii) the income derived from the its real estate development and management enterprises, will be sufficient to cover Management's estimate of the Corporation's cash requirements and the intended future development of the properties, together with general and administrative expenses of the Corporation. Should the Corporation be unable to raise sufficient funds in this Offering, the Corporation may be unable to invest the funds necessary for the Corporation to fully implement its business plan. This is of particular concern in light of the monthly expenses for general and administrative expenses estimated by management to be $120,000 per month. Moreover, if the Corporation is unable to sell the maximum number of Shares offered pursuant to this Memorandum, no assurance can be given that the Corporation will not require additional funds. In such event, the Corporation may be forced to seek additional debt and/or equity financing beyond that originally believed sufficient to implement the Corporation's business plan. There can be no assurance that any such capital, if and when required, will be available on terms acceptable to the Corporation, or at all. In such case, the Corporation would be forced to place additional reliance on operating results to provide it with the necessary cash flow to meet its financial commitments, or the Corporation may be required to seek additional capital. (See "Sources and Use of Proceeds of the Offering")

To fully implement the Corporation's growth strategy and meet its capital needs, if the Corporation is unable to raise sufficient capital through the offering of Shares pursuant to this Memorandum, the Corporation may issue additional equity securities during each phase of its acquisition strategy and/or finance future acquisitions with indebtedness. This could result in a dilution to the purchasers in this Offering. As noted above, there can be no assurance that any such capital, if and when required, will be available on terms acceptable to the Corporation, or at all. Failure by the Corporation to obtain sufficient additional capital in the future could force the Corporation to delay acquisition of additional Properties and to fully implement its business plan. (See "Proposed Operations of the Corporation.")

3.      **Limited Operating History; No Assurance of Profitability; Anticipated Losses.** The Corporation was formed on March 26, 2007, and accordingly, has a very limited operating history on which to base an evaluation of its business and prospects. Accordingly, the Corporation's operations are subject to all the risks inherent in the establishment of a new business enterprise, including potential operating losses. The success of the Corporation is based upon a number of factors, including (i) the ability of the Corporation to successfully complete the Reorganization, (ii) the ability of the Corporation to successfully develop and sell the residential housing in Kingman, Arizona, (iii) the ability of the Corporation to acquire land, develop and successfully lease other real estate properties. Moreover, if the recent catastrophic events of September 11, 2001 or any future events result in a significant economic downturn with consequential high rates of unemployment, the Corporation may not be able to find a sufficient number of tenants to lease its properties and achieve an operating profit.

Although Management has experience in the management, acquisition, rehabilitation, sale, finance, and investment of and in real properties, Management has limited experience in the development or management of other types of properties. The Corporation's business must be considered in light of the risks, expenses and problems frequently encountered by companies in their early stages of development, particularly companies in highly competitive markets such as residential housing, assisted living facilities, light industrial facilities, self-storage leasing and rehabilitation of properties acquired through foreclosure, REO and/or probate sales. There can be no assurance that the Corporation will be successful in addressing these risks, and any failure

Exhibit _____1_____ Page _23_

to do so could have a material adverse effect on the Corporation's business, results of operations and financial condition. The amount of profits and resultant dividends will be dependent, in part, on the amount and rates of growth in the Corporation's revenue derived from the successful leasing and/or sale of the properties, which cannot be guaranteed. To the extent that the amount of revenue derived from its leasing and sale activities does not grow at anticipated rates or increases in operating expenses incurred by the Corporation precede or are not subsequently followed by commensurate increases in such revenue, or the Corporation is unable to adjust operating expense levels accordingly, the business of the Corporation, results of operations and financial condition will be materially and adversely affected. In such case, there can be no assurance that operating losses sustained by the Corporation will not increase in the future or that the Corporation will sustain profitability. (See "Proposed Operations of the Corporation.")

4.    **Maximum Proceeds May Not Be Raised.** The Corporation is seeking gross proceeds from this Offering of a maximum of $25,000,000 before payment of selling commissions, and other offering costs. There can be no assurances that the maximum proceeds from this offering or the subsequent offering will be raised or that, in the event less than the maximum proceeds are raised, that the Corporation will have sufficient funds to fulfill its proposed business plan. Nevertheless, in the opinion of Management, the proceeds of this Offering, together with bank financing, if available, will be sufficient to enable the Corporation to operate at a profit and provide a return to its investors. The funds raised by this offering will be used, as received, for the purposes set forth in the table entitled "Sources and Use of Proceeds of the Offering". (See "Sources and Use of Proceeds of the Offering" and "Proposed Operations of the Corporation.")

5.    **Risks Associated with Forward-looking Statements.** When used within this Memorandum, the words "expect," "believe," "anticipate," "should," "estimate," "may," "will," "seeks," "intends," "plans," "or the negative of these words and phrases and/or similar expressions that convey the uncertainty of future events or statements are intended to identify certain "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21F of the Exchange Act and the Corporation intends that such forward-looking statements be subject to the safe harbors for such statements under such sections. The Corporation's forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to the Corporation's planned acquisition, development and/or operation of the properties. The forward-looking statements and associated risks set forth in this Memorandum include or relate to the ability of the Corporation: (i) to acquire, develop, manage and/or sell the various properties intended to be owned and operated by the Corporation; (ii) to achieve acceptable occupancy levels at and revenues derived from rental of the properties; and the ability of the Corporation to achieve an operating profit sufficient to meet the debt service from a bank loan, if any, and provide a return on capital to the Shareholders.

The forward-looking statements herein are based on current expectations that involve a number of risks and uncertainties. Such forward-looking statements are based on assumptions that there will be no material adverse competitive changes in conditions in the Corporation's business, and that there will be no material adverse change in the Corporation's operations or business or in governmental regulations affecting the Corporation or its operations. The foregoing assumptions are based on judgments with respect to, among other things, future economic, competitive and market conditions, and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the Corporation's control.

## PRINCIPAL TAX RISKS

The Corporation will not seek any tax rulings as to the income tax consequences of an investment in, and ownership interest of, the Shares. Accordingly, positions taken by the Corporation as to the tax consequences could differ from positions ultimately taken by the Internal Revenue Service ("IRS") under its interpretation of the Internal Revenue Code of 1986, as amended (the "Code"). There can be no assurance that the intended tax consequences of investment in the Corporation will be realized. Following is a summary of the principal tax risks of an investment in the Shares. (See "Summary of Income Tax Consequences.")

There are material tax risks associated with an investment in the Shares. These risks include, without limitation, the possibilities that: (i) the IRS may contest the characterization, amounts attributable to or the deductibility, or the tax period in which deductible, of certain items expected to be claimed as deductions by the Corporation; (ii) an audit of the Corporation's information tax return could result in an audit of a Member's tax return; and (iii) a Member may be required to recognize taxable income in excess of distributions from the Corporation, if any. Moreover, changes may occur in various statutory provisions and/or the interpretations thereof that could adversely affect the contemplated tax consequences of ownership of Shares in the Corporation.

Prospective investors have received no tax advice, opinion, or other representation from the management of the Corporation as to the tax aspects of an investment in or the structure of the Corporation. Each prospective investor has been advised to consult with his or her own attorney, accountant or other tax advisor regarding the tax consequences of participating in the Corporation. No assurance can be given with respect to the tax consequences to each investor from an investment in the Corporation, and no investment should be made on the basis of potential tax savings, if any.

Specific federal income tax risks that prospective investors should consider are discussed below.

**Exhibit** ___1___ **Page** ___24___

1.    **REIT Election.**  The Corporation intends to elect to be treated as a Real Estate Investment Trust ("REIT") for tax purposes.  Provided the Corporation derives its income principally from investments in real property, and distributes a minimum of 95% of its net income to its Shareholders as dividends each year, and adheres with other technical rules applicable to REITs generally, the Corporation should be taxed as a REIT as a consequence of which it will be entitled to deduct from its income, and avoid corporate tax on, the amount of such dividends.  Nevertheless, if the IRS successfully challenges the characterization of its investments and income, and other requirements for REIT status, the Corporation may not be able to avoid corporate taxation, as a consequence of which it would be taxed on all income as with corporations generally.  In such case the Corporation would not have as much cash to distribute as dividends.

2.    **UK Taxation.**  Subsequent to the Reorganization, Eagle PLC will be subject to tax on its income in the UK. Although management intends to minimize the impact of such taxes, and although treaties permit a deduction for foreign taxes paid, the Corporation and Eagle PLC may be subject to taxation otherwise not of consequence to a U.S. Corporation. Nevertheless management believes that the ability to freely trade the Shares on the Plus or other market in the UK coupled with favorable capital gains rates of tax provide sufficient opportunities to offset the impact of any increase in tax imposed on the income derived by the Corporation and Eagle PLC.

3.    **Tax Reform.**  The United States tax laws have been repeatedly and often dramatically changed during the 1980's and 1990's.  By way of example, the recently enacted Economic Growth and Tax Relief Reconciliation Act of 2001, signed into law on June 7, 2001, has made significant changes in the rate of taxation and other reforms, the impact of which will not fully be realized until 2010 and beyond.  It is possible that further changes to the tax laws will be proposed or that previous proposals will be revived in some form in the future.  It is impossible to predict with any degree of certainty what proposals may be forthcoming, the likelihood of adoption of any such proposal, the likely effect of any such proposal upon the income tax treatment associated with an investment in the Corporation or the effective date of any legislation which may be passed.  In addition, the Treasury Department may promulgate new Regulations under the Code, the IRS may issue new rulings or procedures, and all such laws are subject to continuing judicial review, the outcome of which cannot be predicted with any certainty.  One or more of these prospective changes in the laws, regulations or interpretation thereof may have a materially adverse effect on the tax treatment of the Corporation and/or its Shareholders.

**THIS LIST OF RISK FACTORS MAY NOT BE COMPREHENSIVE.  EACH PROSPECTIVE INVESTOR IS CAUTIONED AND ADVISED TO MAKE HIS OR HER OWN INQUIRIES AND ANALYSIS WITH RESPECT TO THE CURRENT AND FUTURE BUSINESS PLANS OF THE CORPORATION.**

**[INTENTIONALLY LEFT BLANK]**

Exhibit ___1___    Page___25___

[INTENTIONALLY LEFT BLANK]

Exhibit ___1___ Page ___26___

## SOURCES AND USE OF PROCEEDS OF THE OFFERING

The proceeds from the sale of Shares offered hereby will be used (i) to pay commissions and other expenses of the Offering, (ii) to organize, register, and seek a market maker for the UK PLC and provide for the Reorganization, (iii) for the acquisition, development and management of the various properties, and (iv) for other general operating purposes of the Corporation. The following table sets forth certain estimated information concerning the use of the proceeds from this Offering, assuming the Corporation is able to sell all of the Shares offered pursuant hereto.

|  | MAXIMUM |
|---|---|
| Total Proceeds of the Offering | $25,000,000 (1) |
| Less Offering Expenses | 5,300,000 (2) |
| Net Proceeds of the Offering | $19,700,000 |
| Use of Net Proceeds |  |
| Reorganization Expenses (Legal, Accounting, Registration Fees) | $ 300,000 (3) |
| Property Acquisition and Development | 12,000,000 (4) |
| Development Fees (Architects, Engineers, Construction) | 1,000,000 (5) |
| General Office Overhead (Two Years) | 3 960,000 (6) |
| Uncommitted Working Capital | 2,440,000 (7) |
| **TOTAL** | $19,700,000 |

(1)    The "maximum" represents the maximum proceeds from the sale of the Shares offered pursuant to this Memorandum.

(2)    Includes commissions, fees and non-accountable expenses payable to certain broker-dealers in an amount of up to 20% of the amount of the proceeds from the sale of the Shares sold through participating registered Broker-Dealers, salaries and commissions to employees of the Corporation and/or finders who introduce investors to the Corporation. In addition, the offering expenses include certain legal fees, accounting fees, filing fees, printing costs and related expenses associated with the Offering in an amount estimated to be $60,000 if the maximum proceeds are raised.

(3)    Includes legal, accounting, registration and related fees in connection with the Reorganization.

(4)    Includes amounts necessary to acquire and develop various properties, including the Prairie Heights property in Arizona.

(5)    Includes amounts allocated for the development of the properties, including architects and engineers for the design of the properties and for environmental testing.

(6)    Includes amounts necessary to support the office staff to accommodate the Reorganization and development of the properties for a period until the Corporation is able to raise additional capital and/or cash flow from properties is sufficient to support overhead expenses.

(7)    Represents a capital reserve to provide for contingent working capital and/or development of additional properties. The amount thereof represents approximately 12% of the net proceeds of the Offering if the maximum number of Shares is sold pursuant to this Offering.

The amounts set forth above represent the Corporation's present intentions for the use of the proceeds from this Offering. However, actual expenditures could vary considerably depending upon many factors, including, without limitation, changes in economic conditions, availability and cost of construction, unanticipated complications, delays and expenses, or problems relating to the construction of the properties, time for the Corporation to lease or sell the properties sufficient to achieve an operating profit after debt service, and unforeseen expenses. The Corporation's working capital requirements are a function of its future revenue growth and expansion, neither of which can be predicted with any reasonable degree of certainty. As a result, although Management estimates such proceeds, together with sales revenues, will meet cash operating requirements and enable the Corporation to develop the properties, support overhead expenses, pay all debt service and achieve an operating profit, the Corporation is unable to precisely forecast the period of time for which proceeds of this Offering will meet such requirements.

Potential investors should be aware that the use of proceeds is only an approximation based on Management's reasonable and current estimates and cannot adequately address all of the potential factors which may cause the resultant use to vary substantially from those described.

Exhibit ____ Page 27

## PARTICIPATION IN COSTS AND REVENUES

The Code provides that a REIT must distribute as dividends a minimum of 95% of its net profits each year. Accordingly, the Corporation intends to distribute to its Shareholders 95% of its net profits on an annual basis after achieving an operating profit. The amount of dividends to which each Shareholder is entitled is equal to the percentage of all issued and outstanding Shares of the Corporation owned by such Shareholder.

## [INTENTIONALLY LEFT BLANK]

Exhibit _____I_____ Page _28____

# PROPOSED OPERATIONS OF THE CORPORATION

The Corporation has been organized for the purposes of (1) organizing, capitalizing, acquiring, and managing real estate entities engaged in various aspects of real estate, including, when and if opportunities arise, (i) development of new residential housing projects including development in Kingman, Arizona through the Corporation's wholly owned subsidiary Eagle Housing & Development AZ, LLC ("Eagle Housing AZ") (ii) development of residential rental real estate properties, (iii) development of assisted living facilities including board and care residential facilities, (iv) development of light industrial real estate properties, (v) development of residential apartment housing, (vi) development of public storage facilities, (vii) acquisition of developed and undeveloped real property in foreclosure, trust deed auctions, sales of bank owned real estate ("REO"), probate sales and private sales, and rehabilitation and sales of the properties ("Rehabilitation Development") and (viii) possible acquisition of membership interests of Eagle Assets and Development, LLC, a California limited liability company engaged in business of Rehabilitation Development ("Eagle Assets"), and/or Eagle Storage & Development, LLC, an Arizona limited liability company engaged in the business of owning and operating a storage facility in Lake Havasu City, Arizona ("Eagle Storage"); (2) engaging in a reorganization pursuant to which (a) the Corporation will become a subsidiary of a public liability company ("PLC") to be organized in the UK, upon which reorganization each shareholder of the Corporation will receive one thousand (1,000) shares of common stock of the PLC and ten (10) Shares of the Corporation in exchange for 1000 Shares of Common Stock of the Corporation (the "Reorganization"), and (b) provided the shareholders of the Corporation and a majority in interest of the Members of Eagle Assets and/or Eagle Storage approve of the reorganization, issue shares of stock of the Corporation and PLC to such Members in exchange for their Membership Interests in the those entities, as a consequence of which Eagle Assets and/or Eagle Storage will become subsidiaries of the Corporation.

## Residential Real Estate Development

Initially the Corporation, through its wholly owned subsidiary Eagle Housing & Development AZ, LLC ("Eagle Housing AZ") intends to develop 270 single-family homes in Kingman, Arizona in a development commonly known as "Prairie Heights Estates". Eagle Housing AZ will acquire the land in two phases of 85 homes and 185 homes, respectively. Kingman Arizona has been selected for the initial development for a number of reasons. First, there are a number of new major commercial developments that will require significant employment, including a Wal-Mart distribution center, Federal Express distribution center, a Caterpillar distribution center, a minimum security prison, a new train depot (increasing capacity by approximately 50%), an expansion of the regional freight airport, the reopening of a major steel-mill, and other similar regional hub developments. In addition, the City of Kingman is completing a major new hospital facility. Moreover there is a rumored China and Mexican joint venture to bring a high speed rail system from ports in Mexico to serve this area. Given the climate, proximity to Las Vegas and Laughlin, Nevada, Lake Mead, Nevada, various cities along the Colorado river known for their recreational activities (e.g., Lake Havasu City, Arizona, etc.), the Grand Canyon and other places of interest in Arizona, New Mexico, and Colorado, among others, in the opinion of management Kingman is positioned to support growth of residential housing notwithstanding the pervasive national trend.

In October, 2007, Eagle Housing AZ acquired 85 improved lots from Prairie Heights Estates L.L.L.P., an Arizona limited liability limited partnership ("Prairie Heights Estates") for a purchase price of $5,525,000 payable (i) $400,000 in cash, (ii) $2,750,000 in the form of a loan from Federal Home Loans Corp. and the balance, including in the amount of $2,680,507.92 as a loan from Prairie Heights Estates. The loan from Federal Home Loans Corp. accrues interest at the rate of 12.5 percent , and is payable (a) in twelve monthly installments of $28,645.83, (b) $50,000 upon the sale of each home, and (c) the entire balance payable in 12 months. The loan is secured by the 85 lots and on 39 lots located in Rosamond, California owned by Eagle Assets. In addition to the loan from Federal Home Loans Corp. Prairie Heights Estates has agreed to carry back the balance of the purchase price and closing costs in the amount totaling $2,680,507.92 with interest at the rate of 18 percent per year payable in monthly installments of interest only, the balance payable pro rata upon the sale of each house. 

The Corporation is negotiating a loan with IndyMac Bank pursuant to which IndyMac Bank will refinance the bridge loan and provide construction financing to enable Eagle Housing AZ to commence development of the homes. It is presently anticipated that IndyMac Bank will provide a loan commitment on or before December 31, 2007. Provided the IndyMac Bank loan funds, the Corporation intends to commence construction of the first ten homes in or about January or February, 2008.

After completion of the first phase of 85 homes and upon acceptance of the final plat plan is recorded and the Arizona Department of Real Estate has accepted the public report, Prairie Heights Estates has agreed to grant to Eagle Housing AZ the right of first refusal to acquire an additional 185 lots at a purchase price anticipated to be of $18,525,000.

Eagle Housing AZ intends to engage the services of Arizona Homes of Kingman, LLC an Arizona limited liability company ("Arizona Homes"), which will construct the houses on a profit-sharing basis. Initially Arizona Homes, at its sole expense, will construct two model homes for use by the Corporation. After recoupment of its direct, out-of-pocket expenses incurred in connection with the development of the houses, Arizona Homes will be entitled to a profit of 15 percent on the cost of construction. Eagle Housing is presently negotiating with IndyMac Bank to provide a take-out loan for the acquisition and construction of the homes.

Exhibit ___I___ Page 29

The houses will range from approximately 1,700 (exclusive of the garage and covered patio) to approximately 2,190 square feet (exclusive of the garage and covered patio), situated on lots ranging from approximately 9,300 square feet to 21,650 square feet. Eagle Housing AZ intends to offer the houses at selling prices of $340,000 to $400,000, depending upon the size of the house and lot, with a few of the homes on significantly larger lots featured at a price in excess of $400,000.

Eagle Housing AZ intends to develop the homes in blocks of ten. Accordingly, Eagle Housing AZ will not be exposed for construction costs for additional houses until each block of ten is substantially sold to minimize exposure for unsold inventory. Eagle Housing AZ is seeking a financing package from various lenders to provide competitive financing to qualified purchasers of the homes.

Eagle Housing AZ has entered into an agreement with Bob Bass, an agent with Barbara Ricca Realty – Century 21 pursuant to which the broker will provide comprehensive real estate brokerage services for a commission fixed at six percent.

## Assisted Living Facilities

The Corporation will explore the possibility of developing and operating one or more assisted living facilities. These facilities are designed for elderly persons who no longer desire to be responsible for maintaining their own household. Although different from so-called "nursing homes" in a number of major respects, assisted living facilities are nevertheless licensed by the state. To qualify for residency in these facilities, the residence must generally be capable of taking care of themselves (e.g., bathing, dressing, walking with or without walkers, feeding, etc.). Generally these facilities provide a small apartment with a very small kitchen, living area and bathroom, ranging from studio apartments to one and even two-bedroom residences for couples. The facilities maintain a dining room with three meals served each day, hair styling facilities, recreation rooms and facilities (e.g., swimming pools, gyms, sewing rooms, computer rooms, libraries, gift shop, etc.), transportation to transport residences to doctors appointments, grocery stores, pharmacies, excursions such as plays, concerts, or other outings, among other amenities. In addition to kitchen and dining staff, these facilities generally include receptionists, cleaning and maintenance personnel, drivers, staff for the various recreational facilities, a resident nurse and often a social worker to address problems that elderly residents may encounter.

These facilities generally accommodate from 80 to 200 and more residences. Depending upon the geographic area in which the facilities are operated and the amenities provided, rental rates run from about $2,800 per month to as much as $6,000 per month and more, with additional charges for certain services (e.g., hair styling, recreational outings, etc.). The base rent includes apartment rental, all meals, basic transportation services, and many if not most in-house recreational activities. Present law does not enable residents of assisted living facilities to receive reimbursement from Medicare or other similar governmental subsidies otherwise available to residents of nursing homes.

A variation of the assisted living facilities is so-called "board and care" homes. Developed in existing residential neighborhoods, these facilities are generally licensed for no more than six residents. Homes are remodeled to provide total handicap access including resident-friendly bath and shower facilities. As with the larger assisted living facilities, all meals are provided and assistance given for medical needs. Generally the residents in the board and care homes are less ambulatory and require additional assistance, as a consequence of which the ratio of caregivers to residents is generally one for each three residents (i.e., two staff members are available on a 24/7 basis). These facilities generally do not provide many recreational activities other than television, small libraries, and perhaps an outing or two each month. Doctors and nurses generally visit the patients at these homes, and, accordingly, they are often occupied by disabled persons and individuals suffering from Alzheimer's and/or dementia.

With the anticipated increase in the elderly population due to the retirement of baby-boomers and medical advances enabling more individuals to live far longer, Management believes that there will be an ever-increasing need for assisted living facilities (and board and care facilities) over the next few years and decades. As and when the Corporation identifies communities in which the demand for assisted living facilities is increasing while the elderly are under-served, the Corporation will consider development of assisted living facilities, including board and care facilities.

With the experience of Eagle Assets in the acquisition and rehabilitation of houses in foreclosure, REO and probate sales, the Corporation may well take advantage by acquiring the houses necessary to convert for use as board and care facilities, enabling the Corporation to acquire such facilities at below market rates.

## Light Industrial Facilities

In many communities, light industrial buildings have provided a solution to the need for the combination of office facilities available to the public with light industrial manufacturing, inventory storage, shipping and related activities for small businesses. These facilities are generally situated in a small to mid-size development with from eight to 100 or more rentable facilities. The individual units generally range from 800 to 4,000 square feet and consist of a small front office accessible to the public and a larger rear shell with a roll-up door providing access for equipment, deliveries and shipments. These light industrial facilities are used for myriad industries and purposes including, among others, various types of contractors including residential and commercial construction, pool construction and maintenance, heating and air conditioning contractors and repair services, automobile repair and restoration, and kitchen cabinet manufacturers, among others. Many are used by entrepreneurs for retail

Exhibit _____/_____ Page___30_____

sales of various types of inventory. These facilities generally rent for from $0.65 to $1.50 and more per square foot, depending upon the location and demand.

As opportunities arise, the Corporation intends seek opportunities to develop light industrial facilities. If the Corporation is able to identify communities in which there is a need for such facilities, provided the land and cost of construction are available at a price and on terms are acceptable given the potential rent roll in that community, the Corporation will entertain construction of one or more such light industrial facilities.

**Residential Apartment Housing**

Apartment housing ranges in size from small duplexes to large, multi-tenant facilities featuring 200 and more units. In many communities there is a need for up-scale rental housing providing amenities unavailable at the traditional small to medium sized apartments. Often these complexes can provide, among other amenities, club houses, gyms, swimming pools with outdoor lounges, BBQ facilities, among others. Certain of these facilities designed for executives and others who seek mid-term housing while working on a particular project or while seeking permanent housing in the new community. Furnished, these facilities offer greater privacy and a cost-effective alternative to hotel stays.

The Corporation may entertain the development of residential apartment housing. Provided the Corporation is able to identify communities in which there is a need for apartments, provided the land and cost of construction are available at a price and on terms are acceptable given the potential rent roll in that community, the Corporation will entertain construction of one or more such apartment complexes. Although the up-scale rental housing may be preferred because of the economic stability of potential residents, the Corporation will also entertain construction of mid-level housing in communities in which there is a need for more affordable (albeit not low-cost) rental housing.

**Self-Storage Facilities**

Self-storage facilities offer inexpensive storage space to both residential and commercial users who find the need for temporary or long-term storage to augment existing space in their homes or commercial facilities. In addition to fully enclosed, secure storage spaces, many operators, offer outside storage for vehicles such as mobile homes and boats. Generally the self-storage facilities have perimeter fences, locked gates and lighting to provide security. Generally a President is on-site during business hours and, in many cases, the President resides in an apartment constructed as part of the facility. Customers generally have access during business hours and some commercial users may be provided 24-hour access. Individual storage units are typically secured by a lock furnished by the customer to provide each individual customer with controlled access to their unit.

The business of owning and operating self-storage facilities is highly fragmented. Although the vast majority of these facilities are owned by local and regional operators, there are a few large publicly traded companies that operate such facilities as real estate investment trusts ("REITs"). Over the past few years there has been a proliferation of these facilities. However, many industry consultants believe there is a continuing increase in demand, relatively slow growth in supply and a target market of primarily residential customers.

Historically the self-storage industry is characterized by numerous small, local operators, most of whom operate a single facility. According to published data, of the approximately 32,000 facilities in the United States, fewer than 13% are managed by the ten largest operators.

Although the demand for self-storage facilities has increased significantly over the past several years, a combination of competition and a possible decrease in demand has moderated the growth potential for the industry generally. Nevertheless, in particular areas of the country demand continues to outpace supply. In the opinion of Management, the demand for self-storage units will continue to increase in time due to general population growth, a continuing trend toward increased population mobility, the proliferation of condominium, townhouse and apartment living, and continued increase in consumer awareness, especially among commercial users. Although the vast majority of self-storage units are leased by residential customers, many businesses seek storage space for inventory and/or records. Depending upon the community in which the Corporation sought to develop a storage facility, the Corporation would target commercial users who tend to rent larger units, pay more reliably and are less sensitive to price increases. In addition, both commercial and residential customers are becoming increasingly familiar with the advantages of leasing self-storage units and its favorable comparison to alternatives based on cost and security.

Each of these factors, among others, portends both great opportunity and enormous pitfalls to the success of the business. To mitigate these factors and to capitalize on its opportunities as they arise, the Corporation intends to maximize its profitability by (i) constructing state-of-the-art, secure and automated storage facilities, (ii) purchasing sophisticated computerized management systems to maximize the return on investment, (iii) implementing a focused public relations and marketing program to assure maximum exposure of the storage facilities and (iv) engaging the services of experienced Presidents to reside at or nearby the storage facilities. The Corporation intends to provide certain ancillary merchandise for purchase in the office, including shipping cartons, tape, packing material and locks.

Exhibit ____1____  Page __3|__

As with other real estate facilities, the ability to develop and manage self-storage facilities will be dependent upon the Corporation identifying communities that are underserved in this area and in acquiring land and constructing the facilities at a price and on terms that provide an opportunity to profitably are acceptable given the potential rent roll in that community, the Corporation will entertain construction of one or more such apartment complexes.

## Residential Real Property Rehabilitation and Construction

### 1.    Generally

The business of real estate rehabilitation is a very specialized niche market within the real estate industry. Those individuals and entities with the knowledge and experience necessary to (i) identify, (ii) observe, (iii) research and (iv) track potential acquisition properties have the potential to acquire properties capable of generating a profit. Provided they have sufficient financial resources to make the acquisitions and provide necessary capital improvements, and provided further that they have the capability of marketing the properties for sale, they are generally able to achieve consistent profits from operations. As with most businesses generally, the problem is one of execution. The experience and resources necessary to identify potential properties, to determine the condition of the properties and the neighborhood in which they sit, research the encumbrances and potential problems associated therewith, and track the sales to maximize staff resources is critical to the success of this business.

Among the factors that weigh on the potential profits is the financial resource of the developer. If the properties are acquired using borrowed capital, the interest paid to the financial institution reduces the potential profit, especially for those properties that are not susceptible of a quick sale. In addition, the cost associated with rehabilitation of the properties is often contingent upon the expertise of the contractors hired to perform the capital improvements and the profit margins that they necessarily command.

Each of these factors, among others, portends both great opportunity and enormous pitfalls to the success of the business. To mitigate these factors and to capitalize on its opportunities, the Corporation intends to maximize its profitability by (i) relying on the vast experience and technical resources of its President, (ii) purchase and primarily develop all properties with cash, greatly reducing the expense associated with bank financing, (iii) utilizing in-house construction resources to minimize rehabilitation, development and other construction costs.

### 2.    Sources of Rehabilitation Properties

There are five sources of rehabilitation properties and undeveloped lots, each of which is detailed below.

a.    **Trust Deed Sales of Properties in Foreclosure.** The most common are trust deed sales. After an owner defaults on the loan secured by a trust deed on a property, the lending institution follows certain statutory guidelines in foreclosing on its interest. Provided the borrower does not file for protection under the bankruptcy laws, after appropriate notices are recorded, published and delivered to the borrower in default, the lender proceeds with a trustee sale. These are generally noticed at the "court house steps" at a certain date and time, and with a minimum amount necessary to acquire the property, often less than the outstanding loan balance and almost always at less than fair market value on the open market. To participate in a trustee sale, potential buyers must provide identification and must possess sufficient cashier's checks to meet the selling price. The trustee sale is conducted as an auction; assuming the minimum bid is accepted, other qualified participants are able to "overbid" in increments established by the representative of the trustee. Once the highest bid is accepted by the trustee's representative, papers providing proof of sale to the highest bidder are given in exchange for the cashier's checks in the appropriate amounts.

In many cases, the Corporation may be the only bidder for a property. On others, there may be anywhere from two to six or more active bidders. In the latter case the price may be "bid up" to a price only slightly (10% to 20%) below its fair market value.

b.    **Lending Institution REO Properties.** Those properties that do not receive a minimum bid are deemed foreclosed upon and are taken into the inventory of the lender (typically a bank, thrift or other commercial lending institution). Subsequently the lenders offer these REO properties for sale. It is imperative that the lender divest itself of the REO as quickly as possible, even at a loss, because their ability to loan money is based upon certain federally mandated balance sheet ratios which are enhanced by cash and diminished by REO and other factors. Accordingly, the lenders generally sell these REO properties at a loss, willing to suffer the near-term financial loss in exchange for cash necessary to improve the balance sheet, in turn enabling them to increase their loan portfolio ultimately resulting in higher profits. Often the lender may decide to write down a property at the last minute for this purpose, and the ability of a purchaser to act quickly to acquire the REO property is often imperative.

c.    **Probate Sales.**  A third source of rehabilitation properties is Probate sales. On occasion an executor, burdened with a property in need of rehabilitation, and preferring not to be burdened with the time and expense of contracting for rehabilitation services, is willing to sell the property below its otherwise fair market value. Not unlike the trustee sales, these require a "return of sale" in a Probate proceeding and are generally subject to overbids.

d.    **HUD Sales.** The final source of rehabilitation properties generally are those properties financed by the Federal Department of Housing and Urban Development ("HUD"). Not unlike REO properties, these generally require only acceptance by HUD of the agreed to purchase price from a qualified buyer.

Exhibit ___1___ Page 32

'e.    **Private Sales.** On occasion, the Corporation may be able to acquire Properties from their owners at prices below market. These opportunities generally arise because (i) the owner prefers to avoid the onerous consequences to their credit rating resulting from a foreclosure, or (ii) otherwise need an immediate source of cash and cannot wait to place the property for sale and await a potential buyer. Provided the Corporation determines there is a sufficient differential between acquisition costs and fair market value, the Corporation may acquire both improved rehabilitation Properties and unimproved lots in private sales.

3.    **Corporation Objectives for Rehabilitation Properties.**

The Corporation intends to acquire distressed single-family residential properties in Southern California, primarily in East Los Angeles, San Gabriel Valley, and West San Bernardino (the "Properties"). As the Corporation grows and matures, the Corporation will seek opportunities for acquisition of targeted properties in the balance of Los Angeles County, San Bernardino County, Riverside County, Orange County and even Santa Barbara, Ventura and San Diego Counties. The Corporation will seek to acquire Properties primarily from trust deed sales, lender REO portfolios, probate sales and HUD properties.

The Corporation intends to acquire properties at a maximum of 70% of their fair market value. The majority of targeted properties will be acquired at from 50% to 65% of fair market value. The Corporation will specialize in properties with a fair market value of between $200,000 and $450,000. Generally, the improved Properties acquired will fall within the following criteria (the "Acquisition Criteria"):

- Average purchase price between $300,000 and $400,000, depending on the location.
- Average rehabilitation cost $40,000. Average period of time to complete rehabilitation is 30 days.
- Average selling period is six to eight months from the date of acquisition, depending upon the location.
- Average selling price of between $350,000 to 550,000, depending on the location.
- Average turn of capital two times in any one year (i.e., on average, the Corporation can acquire, rehabilitate, sell, and reinvest in and sell a second property within any given 12 month period).
- Average selling expenses of $25,000.

The typical property will be distressed and in need of substantial structural and cosmetic rehabilitation. By acquiring the worst looking house in any given neighborhood, and transforming it into one of the finest looking homes maximizes its selling price and the potential for a return on investment to the Corporation and its Members.

The typical buyers of the Properties will be first-time buyers with little or no down payment. The properties will typically be financed with Federal Housing Administration ("FHA") guaranteed loan programs. Once a potential buyer is identified, the Corporation will assist the mortgage broker and/or lender in structuring the deal. In the opinion of management, there are opportunities for profits regardless of the condition of the market. In an appreciating market, the return may be lower because (i) there are more qualified buyers willing to purchase, (ii) the price paid at a trustee sale is maximized and (iii) the lending institutions are unwilling to accept steep losses on REO properties. While the opportunities for profits are maximized in a down market, the properties may be held in inventory for a longer period, thereby reducing the number of potential "turns" of capital in acquiring additional properties within any calendar year. In the opinion of Management, there are opportunities for a profit for the Corporation in both "up" and "down" real estate markets. Without the burden of lender financed acquisitions, with the attendant interest carrying costs, even when the properties must be held for a longer period of time prior to sale thereof, a profit will ultimately be achieved.

4.    **Development of New Residential Properties**

Although the principal focus of the Corporation will be on the acquisition, rehabilitation and sale of single-family residential real property acquired through foreclosure and probate, when the opportunity arises the Corporation intends to acquire unimproved vacant lots for development as new residential properties within the same geographic regions as with the rehabilitation Properties, provided such lots, once developed, meet the Corporation's criteria for potential profitability. The Corporation intends to acquire these lots from the same sources as with rehabilitation Properties. In this case the condition of the neighborhood, availability of new homes, and similar market conditions will be evaluated to assure that the Corporation has an opportunity to maximize its use of capital. Although the time to develop and sell New Properties will be somewhat greater than that for rehabilitated Properties (nine to twelve months rather than four to eight months for rehabilitated Properties, on average), potential the profit margin, both in real dollars and as a percentage of investment warrants the Corporation's participation in the development of New Properties.

The Corporation intends to acquire properties at a maximum of 70% of their fair market value. The majority of targeted properties will be acquired at from 50% to 65% of fair market value. The Corporation intends to specialize in acquiring lots with a fair market value of between $75,000 and $225,000. The Corporation will utilize pre-designed architectural drawings ("Cookie-Cutter Plans") appropriate to each lot and neighborhood. By utilizing Cookie-Cutter Plans, the Corporation will (i) save the costs associated with obtaining custom architectural drawings, (ii) avoid the delays associated with development of those plans, (iii) obtain speedy "plan check" from the local planning department, and (iv) carefully control the cost of construction. With its in-house construction staff, the Corporation will be able to develop each Property for approximately $85 per square foot. In the opinion of the President, this is substantially below the cost of construction for most contractors, achieved in great part as a consequence of eliminating the contractor's profit and overhead. Generally, the Corporation anticipates that the unimproved lots and associated development costs will fall within the following criteria (the "Development Criteria"):

Exhibit ___1___ Page ___33___

1.  Average purchase price for an unimproved lot between $100,000 and $300,000, depending upon the location.
2.  Average construction cost between $225,000 and $300,000.
3.  Average period of time to complete construction is 180 days.
4.  Average selling period is eight to 18 months from the date of acquisition.
5.  Average selling price between $400,000 and $750,000, depending upon the development.
6.  Average turn of capital one time in any one to one and one-half year period.
7.  Average profit of between $47,000 and $97,500.

## Reorganization

The Corporation intends to organize a public liability company ("PLC") in the United Kingdom ("UK"). Subsequent to its organization, the Corporation will initially seek to list its Shares of stock on the Plus market, the market operated by Ofex.plc, a wholly owned subsidiary of PLUS Markets Group plc in the UK. The Plus market, somewhat analogous to a hybrid between bulletin board and a mini-version of the NASDAC, provides a vehicle for initial registration of the Shares without the expense and delays associated with registration on the Alternative Investment Market ("AIM") which is more closely analogous to the NASDAC. To provide a market for the Shares, the Corporation will engage a so-called "market maker" willing to "make a market" in the Shares (i.e., purchase Shares for its own account to assure that there are Shares available for sale and a buyer willing to purchase Shares at all times). The market maker sets the price of the shares based on the demands of the market at any particular time. The Corporation intends to engage Courtney Smith & Co., Inc. to provide investment bank consulting services in connection with the registration of the Shares and engagement of the market maker. The Corporation intends to engage the services of The Tenan Group in London, England to provide legal and accounting services in connection with the organization of the PLC and accounting as required.

Upon consummation of the reorganization, Eagle PLC will distribute 1,000 shares of Eagle PLC stock to the Shareholders for each 1,000 Shares of the Corporation's stock and (ii) the Corporation will distribute 10 Shares of the Corporation's stock for each 1,000 Shares contributed to Eagle PLC. Upon completion of the reorganization, shares of Eagle PLC stock will immediately become freely tradable without restriction thereon. The Plus market typically lists stocks in pennies, rather than pounds, as a consequence of which Eagle PLC may declare a significant stock split prior to the listing.

Once the PLC has developed a track record on the Plus market, management intends to register Eagle PLC on the AIM. The AIM has a greater operating volume than the Plus market and will provide a more favorable trading environment for Eagle PLC over the long term. Without an operating history, registration on the AIM is cost prohibitive and quite difficult in comparison to the Plus market.

Subsequent to listing the PLC Shares and engaging in the exchange with the Shareholders for their shares of Stock, two related entities will be offered an opportunity to participate in the Reorganization. Eagle Assets & Management, LLC, a California limited liability company ("Eagle Assets") was formed on October 16, 2000 for the purposes of (i) acquires developed and undeveloped residential real property in foreclosure, trust deed auctions, sales of bank owned real estate ("REO"), probate sales and private sales, (ii) providing capital improvements to the properties, and (iii) selling the properties at a profit. Eagle Assets raised approximately $4,500,000 to fund its operations. Approximately two years after the organization of Eagle Assets, the housing boom coupled with low interest rates resulted in a significant diminution of the number of properties in foreclosure and REO. In addition, properties sold through Probate were subject to significant overbids at auction. Accordingly Eagle Assets was unable to acquire the properties at prices and on terms deemed acceptable within the parameters of its acquisition criteria.

Over the past few months, however, as a consequence of the subprime lending problems, increase in real estate inventory, and falling prices, there has been a significant increase in the rate of defaults on loans and consequent foreclosures. Accordingly, Eagle Assets is evaluating acquisitions on a more aggressive basis. Presently Eagle Assets has decided to lease its properties to provide cash flow until the real estate market firms. As of the date of this Memorandum Eagle Assets has leased two of its homes, is attempting to lease a third, and is completing renovation on a forth property. Provided the market for leasing accelerates Eagle Assets may acquire properties for sale, lease and/or leases with options to sell.

 Because of the nature of its business, the purchase, rehabilitation and sale of properties is fluid. As of the date of this Memorandum Eagle Assets has four residential properties in various stages of development and holds a 100 acre parcel of land in Lancaster, California that it intends to either (i) sell to a developer or (ii) subdivide into 39 lots and develop houses thereon.

The Storage Facility was constructed for a total of approximately $18,400,294. In addition, Eagle Storage acquired various equipment for the operation of the Storage Facility including (i) vehicles, (ii) office equipment, (iii) computer equipment and software and (iv) furniture and fixtures, and has leased a vehicle for use at the Storage Facility at a total cost of $226,371.

The Storage Facility includes a total of approximately 272 individual RV and boat rental units ("Units") including (i) 67 each 12' x 30' (360 square feet) Units, (ii) 72 each 13' x 40' (480 square feet) Units, (iii) 82 each 15' x 50' (600 square feet) Units and (iv) 51 each 15' x 60' (720 square feet) Units for a total of approximately 168,960 square feet of rentable RV and boat space. In addition, the air-conditioned facility includes approximately 358 individual mini-storage Units including (1) 41 each 5' x 5' (25 square feet) Units, 83 each 5' x 10' (50 square feet) Units, 192 each 10' x 10' Units (100 square feet) and 42 each 10' x 15' (150 square feet) Units for a total of approximately 30,675 square feet of rentable air-conditioned individual Share space, and the non-

air-conditioned building will include approximately 11 each 5' x 5' (25 square feet) Units, 17 each 5' x 10' (50 square feet) Units, 24 each 10' x 10' (100 square feet) Units, 9 each 10' x 15' (150 square feet) Units, 13 each 10' x 20' (200 square feet) Units, and 1 each 14' x 20' (280 square feet) Units for a total of approximately 7,755 square feet of rentable regular individual Share space for a total of approximately 207,390 square feet of total rentable space. In addition, the Storage Facility will include a total of 2,842 square feet dedicated for office space and an apartment for an on-site manager.

The Corporation has provided an integrated management information system that incorporates billing, collections and reservation functions and tracks information used in developing a marketing plan such as occupancy levels, tenant demographics and histories. The system, accessible from the Corporation's offices in Arizona, generates daily, weekly and monthly financial reports. The local property manager will input an explanation of all debit and credit transactions, billing adjustments and other discretionary charges, allowing the President to promptly review such activity. The billing system will automatically impose late charges.

As of the date of this Memorandum, the storage facility has been completed and Eagle Storage has leased approximately 60 percent of the available boat and recreational vehicle storage units, ten percent of the mini storage units and two percent of the temperature controlled storage units with the intention of commencing an advertising campaign for those units in November, 2007.

The property is located to the North of Lake Havasu City at the Northeast corner of the intersection of Chenoweth Road and Victoria Farm Road approximately one-fourth mile to the West of Highway 95 (the main artery linking Southern California with the city via Highway 40). The area in which the property is comprised primarily of large parcels of undeveloped, virtually none of which is presently on the market. The property is located within one-fourth mile of a new shopping center, the first tenant of which is Home Depot.

Across from the Property a 407-unit recreational vehicle park has been completed on a 40-acre parcel of property and is presently leasing spaces. It should be noted that the various recreational vehicle parks within the Lake Havasu City area require that the recreational vehicles ("RVs") be removed to storage when not in use. Moreover, most boat owners don't leave their boats and other watercraft in docks when not visiting the area. Accordingly, while many residents may drive their RVs and tow their boats or watercraft back home when their weekend, holiday or vacation stay is over, most prefer the convenience of storing these vehicles and boats in a secure environment when not enjoying the amenities offered in Lake Havasu City. The owner of the adjacent recreational vehicle park is anxious for the Corporation to complete the Storage Facility to enable his customers to have easy access to recreational vehicle storage.

Prior to the Reorganization, a meeting of Shareholders will be called to approve of the Reorganization including approval of the involvement by the members of Eagle Assets and Eagle Storage to participate therein.

[INTENTIONALLY LEFT BLANK]

[INTENTIONALLY LEFT BLANK]

Exhibit __1__ Page__36__

# MANAGEMENT

The Corporation will be managed by Michael J. Bowen and Jose ("Joe") Maldonado.

**Michael J. Bowen, President, CEO and Chairperson of the Board**

Michael J. Bowen, age 52, is the President and the President of the Corporation. Mr. Bowen has over 21 years experience in construction, including extensive experience in remodeling kitchens, offices, and laundry areas for hospitals, and in remodeling homes and providing residential room additions and conversions. In 1979, Mr. Bowen began in the real estate construction business, working on long-term contracts with Beverly Enterprises Hospitals. By 1987, he began performing remodeling work on behalf of the hospitals, and the development of new wings to existing hospital properties and adding complete office buildings. At that time Mr. Bowen began remodeling homes, constructing room additions and conversions.

Mr. Bowen commenced work on REO properties with two investors in 1994, in which he was responsible for the rehabilitation construction on the homes. Based upon his experience, in 1995 he purchased his first REO property for $95,000. After rehabilitation expenses, the property sold for $150,000 resulting in a return on investment ("ROI") of 43%.

In 1996, Mr. Bowen partnered with investors in acquiring, rehabilitating and selling similar REO properties, with a ROI ranging from 25% to 39% on each such property. For the past five years, Mr. Bowen has worked full time in real estate rehabilitation projects, working with REO, probate, and trust deed sales at auction to acquire, rehabilitate and sell a total of 20 additional properties for his own account and with others. During this time he has not been involved with any Corporation.

Mr. Bowen is the Manager and President of Eagle Housing & Development AZ, LLC, Eagle Assets & Management, LLC and Eagle Storage & Development, LLC.

**Jose ("Joe") Maldonado, Vice-President and Member of the Board**

Jose ("Joe") Maldonado, age 31, is the Vice President and Director of the Corporation. A licensed General Contractor, Class B, and a licensed Home Improvement Contractor (HIC License), Mr. Maldonado has over 17 years experience in the construction industry. While in middle school, at age 14, Mr. Maldonado began working part-time as an apprentice in the construction industry to earn money to help his family. Initially working as an apprentice – picking up trash, bringing materials on site, and other medial chores, Mr. Maldonado then worked as a framer, installed drywall, and learned to work as an electrician, among other duties. While in high school Mr. Maldonado worked for four years for Homeowners Equity, a large construction company, where he quickly advanced to a position of foreman.

Mr. Maldonado was persuaded to join Michael J. Bowen first for rehabilitation construction projects for Mr. Bowen personally and subsequently on behalf of Eagle Assets, Eagle Construction, Eagle Housing AZ, and as an owner of Eagle Housing & Development, Inc., the entity that provides construction services on behalf of Eagle Assets on a cost only basis as well as projects for third parties. At Eagle Assets, Mr. Maldonado is responsible for evaluating and purchasing properties in foreclosure, providing improvements and listing them for sale. Mr. Maldonado assists Mr. Bowen at all of the various Eagle entities, serving as a defacto "second-in-command". In that capacity, he assisted in the development and pre-construction on behalf of Eagle Storage, grating and preparing the land for TLW Construction, the general contractor for the Storage Facility, and in evaluating and coordinating the acquisition and construction for Eagle Housing AZ that intends to construct 270 homes in Kingman, Arizona.

**Board of Directors**

Messrs. Bowen and Maldonado are presently the only directors serving on the Board. Mr. Bowen intends to seek approval of the Shareholders for appointment of four additional members, including one independent director representing the Shareholders of the Corporation.

**Corporation Expenses**

The Corporation will pay to the President compensation in the amount of $20,000 per month and the Vice President $11,000 per month, subject to reasonable increases and/or bonuses as approved by the independent members of the Board of Directors. In addition, the Corporation will reimburse the officers and directors for all ordinary and necessary expenses incurred in the organization, management and operation of the Corporation and its properties.

Exhibit ____I____ Page 37

## PRINCIPAL SHAREHOLDERSHIP INTEREST HOLDERS

The following table sets forth information regarding the beneficial ownership of the Corporation's Shares and Founders Interests as of October 1, 2007:

| BENEFICIAL OWNER | SHARES | |
|---|---|---|
| Michael J. Bowen, President | 25,000,000 | Founders Interests |
| Jose ("Joe") Maldonado | 10,000,000 | Founders Interests |
| Total Shares | 35,000,000 | |

The Corporation believes that the beneficial owners of Shares set forth above, based on information furnished by such owners, have sole investment and voting power with respect to such Shares, subject to community property laws where applicable. Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities.

[INTENTIONALLY LEFT BLANK]

Exhibit ____ l ____ Page ___38__

# DESCRIPTION OF SECURITIES

## General

The Corporation is offering a total of a maximum of 25,000,000 Shares at a purchase price of $1.00 per Share. Shares are being offered to qualified purchasers who are reasonably believed to be accredited purchasers. (See "Who Should Invest -- Investor Suitability Standards.") The minimum purchase is 50,000 Shares ($50,000), except as authorized by the President in his sole and absolute discretion.

## Distribution of Shares

The Corporation has not engaged an underwriter for the distribution of the Shares. Therefore, the selling price of the Shares offered pursuant to this Offering has not been determined as a result of arms-length negotiations, and the terms of the Offering have not been negotiated in the same manner as if an independent underwriter were involved. In addition, because the Corporation does not have a significant operating history, the value of the Shares has been arbitrarily established without reference to such factors as prior earnings or book value. The Corporation intends to retain one or more broker-dealers who are registered with the NASD to place the Shares on a "best efforts" basis, in consideration for which they will be entitled to (i) commissions in an amount of up to 15%, (ii) non-allocable expenses in an amount of up to 3%, and (iii) due diligence fees in an amount of up to 2% for all Shares placed on behalf of the Corporation. Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% and office expenses of up to 5% of the proceeds to certain individuals who introduce investors to the Corporation. As a result, the amount of selling fees related to the sale of the Shares will vary depending upon the method employed to sell any of the Shares. Accordingly, the Corporation may pay fees and/or incur expenses in an amount equal to a maximum of 20% of any Share sold. The Corporation will not pay any commission, finders' fees or other amounts to the President or any Officer of the Corporation. The Offering will terminate at the earlier of (i) July 31, 2008 or (ii) when all Shares being offered are sold (the "Offering Termination Date"); provided, however, that the Board of Directors of the Corporation (the "Directors"), in the Director's sole and absolute discretion, may (a) extend the Offering Termination Date to a date no later than December 31, 2008 or (b) terminate the Offering at any time. (See "Terms of the Offering".) The sale price of the Shares has been arbitrarily determined by the Corporation and does not necessarily bear any relationship to the Corporation's book value, assets, past operating results, financial condition, generally accepted accounting principles or any other established criteria for establishing value. (See "Terms of the Offering" and "Risk Factors")

## Shares

Ownership in a Corporation is through Shares. The Corporation is authorized to issue a total of five hundred million (500,000,000) Shares of Common Stock. Prior to, and effective on the date of this Offering, the Corporation has issued (a) twenty-five million (25,000,000) Shares of Common Stock to Michael J. Bowen, the President and CEO of the Corporation and ten million (10,000,000) Shares to Jose ("Joe") Maldonado, the Vice President of the Corporation, in consideration for which Messrs. Bowen and Maldonado have contributed to the Corporation (i) all of their right, title and interest in and to Eagle Housing & Development AZ, LLC ("Eagle Housing AZ"), an Arizona limited liability Corporation organized to develop approximately 270 single family residential homes in Kingman, Arizona and (ii) other valuable assets in connection with the organization of the Corporation and (b) thirty million fifty thousand (30,050,000) Shares to third party investors at a purchase price of twenty cents ($0.20) per Share to provide bridge financing for the Corporation. Subsequent to this Offering, and assuming the total Offering of 25,000,000 Shares of Common Stock is subscribed for, there will be a total of approximately 90,050,000 shares of Common Stock issued and outstanding that will represent 100% of the ownership of the Corporation with voting power in proportion to the number of Shares held. In addition, assuming the Reorganization is consummated and all of the Shareholders of Eagle Assets and Eagle Storage elect to exchange their Membership Interests in the respective Eagle Entities for Shares of Common Stock of the Corporation, there will be approximately 130,000,000 Shares of Common Stock of the Corporation issued and outstanding.

## Voting Rights

All matters requiring the vote, approval, consent, authorization or determination of the Shareholders shall require a vote of Shareholders holding a majority of the Shares. Each Shareholder is entitled to one vote for each Share held.

## Additional Capital

The Corporation reserves the right to raise additional capital in one or more additional offerings if necessary to develop the properties. The Corporation intends that the offering of additional Shares will be on terms no more favorable to subsequent investors as are offered pursuant to the terms of this Offering.

Exhibit ___I___ Page__39__

[INTENTIONALLY LEFT BLANK]

Exhibit _____|_____ Page_ 46

# TERMS OF THE OFFERING

**Plan of Distribution**

The Corporation is offering a maximum of 25,000,000 shares of common stock of the Corporation ("Shares") at a purchase price per Share of $1.00. The sale price of the Shares offered hereby have been arbitrarily determined by the Board of Directors and does not necessarily bear any relationship to the Corporation's book value, assets, past operating results, financial condition, generally accepted accounting principles or any other established criteria of value. (See "Risk Factors" and "Description of Securities")

The Shares are being offered on a "best efforts" basis solely to qualified investors who are reasonably believed to be qualified purchasers (See "Who Should Invest -- Investor Suitability Standards") The Offering will terminate at the earlier of (i) July 31, 2008 or (ii) when all Shares being offered are sold (the "Offering Termination Date"); provided, however, that the Board of Directors of the Corporation (the "Directors"), in the Director's sole and absolute discretion, may (a) extend the Offering Termination Date to a date no later than December 31, 2008, or (b) terminate the Offering at any time. As determined by the Corporation, the Shares will be sold through officers and directors of the Corporation and through broker-dealers who are Shareholders of the NASD. Any broker/dealers participating in the offering will receive (i) commissions in an amount of up to 15%, (ii) non-allocable expenses in an amount of up to 3%, and (iii) due diligence fees in an amount of up to 2% of the gross proceeds from all Shares placed on behalf of the Corporation. Alternatively, the Corporation may pay salaries and commissions to employees and/or finders' fees of up to 15% and office expenses of up to 5% of the proceeds to certain individuals who introduce investors to the Corporation. As a result, the amount of selling fees related to the sale of the Shares will vary depending upon the method employed to sell any of the Shares. Accordingly, the Corporation may pay fees and/or incur expenses in an amount equal to a maximum of 20% of any Share sold. The Corporation will not pay any commission, finders' fees or other amounts to the President or any Officer of the Corporation. In addition, the Corporation will not pay any commissions, finder's fees or other amounts with respect to the acquisition of any Shares by the President. As a result, selling fees related to the Offering will vary depending on the status of the person(s) placing the Shares on behalf of the Corporation, but in no case will exceed 20%.

The minimum initial investment for a purchaser will be $50,000 to acquire 50,000 Shares except as the President may otherwise determine in his sole and absolute discretion. The Shares are suitable for investment only by prospective investors who meet the qualifications of an "accredited investor", as that term is defined under Rule 501(a) of Regulation D promulgated under the Securities Act. (See "Who Should Invest -- Investor Suitability Standards.")

Attached as Appendix "C" to this Memorandum are a Subscription Agreement and Confidential Purchaser Questionnaire for persons interested in subscribing for the Shares. Persons subscribing for the Shares must complete the Subscription Agreement and Confidential Purchaser Questionnaire and, if appropriate, Purchaser Representative Questionnaire, provide a check in the amount of their proposed purchase, made payable to: "EAGLE DEVELOPMENT ENTERPRISES, INC." With respect to any Shares sold by the Corporation, checks should be delivered, along with all other required documents, to: EAGLE DEVELOPMENT ENTERPRISES, INC., 2125 E. KATELLA AVENUE, SUITE 350, ANAHEIM, CALIFORNIA 92806. Checks delivered to agents of the Corporation will be deposited into the Corporation's general account. Accordingly, such funds will be made immediately available to the Corporation. The Corporation will determine whether to accept or reject subscriptions within thirty (30) days of their receipt from a Prospective Investor of a properly executed copy of the Subscription Agreement, as well as a check for the Shares purchased. In the event the Corporation rejects a Prospective Investor, the Corporation will cause all funds received from a Prospective Investor to be promptly returned without interest thereon.

The Subscription Agreement sets forth certain terms and conditions regarding an investment in the Shares. In addition, the Subscription Agreement contains representations and warranties of the Prospective Investor that will be relied upon by the Corporation in complying with its obligations under the applicable securities laws. Therefore, care should be taken in reading and completing the Subscription Agreement to insure accuracy and completeness.

**Distribution of Shares; Compliance Calls and Due Diligence**

The Corporation has not engaged an underwriter for the distribution of the Shares. Therefore, the selling price of the Shares offered pursuant to this Offering has not been determined as a result of arms-length negotiations, and the terms of the Offering have not been negotiated in the same manner as if an independent underwriter were involved. In addition, because the Corporation does not have a significant operating history, the value of the Shares has been arbitrarily established without reference to such factors as prior earnings or book value. The Corporation may retain one or more broker-dealers to place the Shares on a "best efforts" basis. The Corporation may agree to indemnify a member NASD broker-dealer against liability arising out of the placement of the Corporation's Shares. Such broker-dealers will likewise be entitled to receive (i) commissions in an amount of up to 15%, (ii) non-allocable expenses in an amount of up to 3%, and (iii) due diligence fees in an amount of up to 2% of the gross proceeds from all Shares placed on behalf of the Corporation. Alternatively, the Corporation may pay salaries and commissions to employees and office expenses of up to 5% and/or finders' fees of up to 15% of the proceeds to certain individuals who introduce investors to the Corporation. As a result, the amount of selling fees related to the sale of the Shares will vary depending upon the method employed to sell any of the Shares. Accordingly, the Corporation may pay fees and/or incur expenses in an amount equal to a maximum of 20% of any Share sold. The Corporation will not pay any commission, finders' fees or other amounts to the President or any Officer of the Corporation.

Exhibit _____ Page __4)

**Subscription Procedures**

In order to subscribe for the Shares offered hereby, each prospective investor will be required to deliver to the Corporation or to the Placement Agent on the Corporation's behalf, a check payable to **"EAGLE DEVELOPMENT ENTERPRISES, INC. "** in the amount of $1.00 multiplied by the number of Shares for which the purchaser wishes to subscribe, with a minimum purchase of 50,000 Shares ($50,000). In addition, the prospective investor must complete, execute, and deliver the following to the Corporation:

      (1)    A dated and fully executed Subscription Agreement, Confidential Purchaser Questionnaire and, if appropriate, Purchaser Representative Questionnaire. These documents include certain representations by such investor relating to such investor's subscription.

      (2)    If the prospective investor is subscribing for Shares on behalf of an entity (i.e., other than an individual), the investor shall supply the Corporation with a properly executed instrument authorizing the purchase by the agent on behalf of the entity.

      (3)    With respect to any Shares sold by the Corporation, checks should be delivered, along with all other required documents, to: **EAGLE DEVELOPMENT ENTERPRISES, INC., 2125 E. KATELLA AVENUE, SUITE 350, ANAHEIM, CALIFORNIA 92806** in the amount of $1.00 for each Share which the purchaser intends to subscribe for, with a minimum purchase of 50,000 Shares ($50,000), except as provided in this Memorandum.

Subscription Agreements are not binding upon the Corporation until accepted by the Corporation, which reserves the right to reject, in whole or in part, in its sole discretion, any lesser number of Shares than the number for which the investor has subscribed. If the Corporation rejects all or a portion of any subscription, the Corporation will promptly mail to the subscriber a check for all, or the appropriate portion of, the amount submitted with such subscriber's subscription.

The Certificates for the Shares will be delivered to the purchaser as soon as is practicable after (i) at least five business days have passed from the date of the delivery of the Memorandum to such purchaser, (ii) the subscription is approved by the Corporation, (iii) the funds are deposited into the escrow account and clear the purchaser's bank, and (iv) the minimum number of Shares offered pursuant to this Memorandum are subscribed.

As noted above, if the Corporation is unable to sell the minimum number of Shares offered pursuant to this Memorandum, all proceeds of this Offering will be refunded to the purchasers by the escrow agent without interest thereon.

**[INTENTIONALLY LEFT BLANK]**

Exhibit \_\_\_1\_\_\_\_ Page\_\_42\_\_\_

# SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES

### General

The following is a brief summary of some of the more important federal income tax considerations under existing law that may be relevant to prospective investors. The discussion of tax considerations in this section and elsewhere in this Memorandum is intended only as a general overview, and many of the tax provisions discussed are subject to varying interpretations. Since the applicability of the federal income tax laws to particular investors will vary dependent upon all relevant facts, this discussion does not attempt to set forth all the provisions of tax law that may be applicable to investors. Additionally, it is expressly noted that the discussion does not address state, local, or foreign tax consequences associated with an investment in the Corporation. Accordingly, this summary is not intended as a substitute for careful tax planning, and prospective investors are urged to consult their own tax advisors about the federal, state and local tax consequences to them prior to investing in the Corporation. This summary is not intended as tax advice to offerees and should not be considered to be such advice by them.

The following discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), the applicable Treasury Regulations (the "Regulations" or "Treas. Regs.") and proposed Regulations, as well as the published rulings of the IRS and existing judicial interpretations of the foregoing, all existing as of the date of this Memorandum. It must be emphasized, however, that all such authority is subject to modification at any time and that any such modification could be applied on a retroactive basis. Prospective investors should be particularly aware of the fact that many recent changes to the tax law have not been interpreted by final Regulations or rulings and have not received judicial consideration. Uncertainty, therefore, exists regarding certain of the tax considerations described in this summary.

Even under current law, however, the existence, amount and timing of certain deductions expected to be claimed by the Partnership involve complex legal and factual issues and will depend upon certain factual determinations, characterization of certain expenditures and other matters, all or any of which may be subject to challenge and possible disallowance by the IRS upon audit either of the Partnership's information tax return or the tax return of any Member. As a result of such an audit, there is a possibility that income tax returns of the Shareholders may also be audited. Adjustments to items in the Corporation's information return on audit would necessitate corresponding amendments to each Member's federal income tax return; an audit of the Shareholders' returns might also result in adjustments to items unrelated to the Corporation.

**DUE TO THE COMPLEXITY OF THE TAX LAWS, POTENTIAL INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS (AT THEIR EXPENSE) WITH SPECIFIC REFERENCE TO THEIR RESPECTIVE TAX SITUATION PRIOR TO SUBSCRIBING FOR SHARES.**

### Classification of the Corporation as a Real Estate Investment Trust ("REIT") for Federal Income Tax Purposes

The Corporation will elect to be treated for federal income tax purposes as a REIT for federal and state income tax purposes. As a consequence thereof, provided the Corporation meets the requirements for taxation as a REIT under the Code and Treas. Regs., the Corporation will not be subject to corporate income taxes on its profits.

### Qualification as a REIT

A REIT is an entity that acts as an investment agent specializing in real estate. To qualify as a REIT, at least 95% percent of the Corporation's gross income must be from real-property sources (e.g., gain from the sale or other disposition of real property, rents from real estate, etc.) and from investments (e.g., dividends, interest, gains from the disposition of securities, etc.) and at least 75 percent of the Corporation's gross income must be from real-property sources (e.g., gain from the sale or other disposition of real property, rents from real estate, mortgage interest, income and gain from foreclosure property, and certain qualified temporary investment income). Rents from real estate includes not only rent received by tenants in residential and commercial real estate but also rents from interests in real property, charges to tenants for services customarily provided in connection with rental of real property (e.g., utilities, insurance, common area maintenance charges, etc.), and rent attributable to personal property included in the rental of the real property, provided the amount thereof does not exceed 15 percent of the fair market value thereof.

At least 75% of the value of the total assets of the REIT must consist of real estate assets, cash or equivalents, no more than 25% of the value of its assets may be invested in securities other than real estate assets or government securities, no more than 20% of the value are invested in taxable REIT subsidiaries, and no more than five percent of the value of its assets can be invested in securities of any one issuer. Management intends to comply with all of these requirements.

To qualify as a REIT, the entity must distribute to its shareholders as dividends each year the sum of 90 percent of its ordinary taxable income (determined without deduction for dividends paid) and 90 percent of its net income from foreclosure property, over its excess noncash income. Although the REIT is subject to tax at regular corporate tax rates (up to 35%), in calculating taxable income for Federal income tax purposes, a deduction is allowed for dividends paid to its shareholders. In calculating the dividends paid deduction, dividends declared in October, November or December of each year are treated as paid on December 31 of that year provided the dividends are paid no later than January 31 of the following year. With respect to capital gains, the Corporation must designate any dividend as capital gains dividends in written notice to its shareholders.

Exhibit _____ Page _43_

**Taxation of Dividends received by REIT Shareholders**

Under Code Section 316(a), dividends distributed by a corporation are taxable at lower rates if they are "qualified dividends." Under present law, prior to 2011, qualified dividends are taxed at 15 percent, the same rate as capital gains. In addition, dividends deemed to be distributions of income from capital gains are taxed at the 15 percent rate as well. Generally dividends distributed by the REIT to its Shareholders are not qualified. Accordingly, dividend distributions attributed to ordinary income from rents and sales of real estate property in inventory will not be deemed to be qualified dividends, as a consequence of which they will be taxed at the shareholders marginal rate (up to 35 percent).

There are two exceptions to this rule. First, to the extent the REIT receives dividends from an investment in another entity, to the extend dividends distributed by the REIT attributed to such dividend income will be qualified dividends if they would have been treated as qualified dividends if received directly by the shareholder. Second, to the extent the dividends distributed by the REIT are attributed to income from capital gains, the amount of dividends will be treated by the shareholder as capital gains subject to the lower capital gains rates (up to 15 percent).

**Tax Basis of an Interest; Sale or Other Disposition of Shares**

A Shareholder's tax basis for Shares will be equal to the purchase price paid for the Shares. Upon the sale of the Shares, a Shareholder will recognize income in an amount equal to the difference between the sale price for the Shares (less commissions and other costs for the disposition) and the Shareholder's tax basis. Provided the Shares are held for a minimum of one year prior to the sale thereof such gain will be taxed at the favorable capital gain rates (presently 15 percent).

**Tax-Exempt Investors**

Tax-exempt organizations, including employee pension, profit sharing trusts, and Keogh Plan trusts, which are qualified under Section 401 of the Code, and individual retirement accounts, are generally exempt from federal income taxation. However, such organizations are subject to taxation on their "unrelated business taxable income," as defined in Section 512 of the Code ("UBTI"). Dividends, interest, and gains from the sales of capital assets generally are excludable from the computation of UBTI. Accordingly, income attributable to dividends received will be exempt from federal income taxation to organizations exempt from tax under Code section 501, including pension plans, profit-sharing plans, 401(k) plans, IRAs, and similar employee benefit plans.

**ALL POTENTIAL INVESTORS WHO MAY BE SUBJECT TO FEDERAL TAX ON UBTI ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE IMPACT, WHICH AN INVESTMENT IN THE COMPANY WILL HAVE ON THEIR OWN SITUATION.**

**Nonresident Alien or Foreign Corporate Limited Partners**

Members who are not citizens or residents of the United States or that are foreign corporations will be subject to all applicable withholding provisions of the Code that are designed to insure that federal income taxes are paid on dividends as and when received. Foreign investors are strongly urged to consult their own tax advisors with respect to all the United States tax consequences, including United States gift and estate tax consequences, of ownership of an interest in the Company.

**Backup Withholding**

In the case of any Shareholder who is a non-corporate US citizen or resident, a 28% "backup" withholding tax will apply to certain distributions by the Company unless such Shareholder properly completes, under penalties or perjury, and files, as directed, IRS Form W-9 (or its equivalent).

**State, Local, and Foreign Taxes**

In addition to federal income taxes, potential investors should consider the potential impact of state, local, and foreign taxes. Each investor is urged to consult with his or her own tax advisor concerning the state, local and foreign tax consequences of an investment in the Corporation and receipt of dividends therefrom.

**Possible Changes in Federal Tax Laws**

With respect to all of the foregoing matters, the Code is subject to change by Congress, and interpretations of the Code may be modified or affected by Regulations promulgated by the Treasury Department, by judicial decisions, and by the IRS through its audit policy, announcements, and published and private rulings. Such changes may be retroactive. Accordingly, the ultimate tax consequences of an investment in the Corporation may be governed by laws, regulations, or interpretations of laws or regulations which have not yet been proposed, passed, or made, as the case may be. While in the past significant changes often have been given only prospective application, no assurance can be given that any changes made in the tax law affecting an investment in the Corporation would be limited to prospective effect. The foregoing may be of particular importance in light of the announced policy of the President and Congress to enact tax reduction legislation, the consequences of which cannot be predicted with any

Exhibit ____|____ Page __44__

certainty. There is particular uncertainty as to the taxation of qualified dividends and capital gains upon the expiration of those provisions of the Code effective January 1, 2011.

As noted earlier, the foregoing summary is limited in nature, and no attempt has been made to summarize all of the relevant provisions of the Code that may be of consequence to an investor. Potential investors are therefore strongly urged to consult with their independent advisors prior to making a decision as to whether or not to make an investment in the Company.

**Taxation upon Reorganization**

Assuming the Reorganization is consummated, dividends received with respect to the Shares of the Corporation retained by the Shareholders will be taxed as more fully described above. However, with respect to the shares received from Eagle PLC, a different tax scheme will apply. First, the PLC will be required to pay taxes in the UK on corporate earnings, anticipated to be from 13 to 15 percent. Shareholders may be required to pay taxes in the UK on dividends received from Eagle PLC. However, to mitigate the potential double taxation that would accrue on foreign-source income, Shareholders will be entitled to a credit or deduction against U.S. source income for taxes paid or accrued to the UK.

During such time as 50 percent or more of the shares of Eagle PLC are held by United States shareholders, Eagle PLC will be deemed to be a "controlled foreign corporation ("CFC"). Accordingly, the shareholders will be required to report as income on their personal tax return a pro rata share of income derived by Eagle PLC. The amount thereof will be reduced by the amount of dividends distributed by Eagle PLC to the shareholders. The Corporation will be entitled to a foreign tax credit for any taxes paid by the CFC for income received as a dividend distribution.

One potential tax benefit ultimately accruing from the Reorganization will be the ability of shareholders to time, and report as capital gains income derived from, the sale of shares of Eagle PLC. Under present law, most shareholders would benefit from the lower capital gain rate of taxation (presently 15 percent).

**[INTENTIONALLY LEFT BLANK]**

Exhibit ____1____ Page__45__

# ERISA CONSIDERATIONS

**General Fiduciary Obligations**

Trustees and other fiduciaries of qualified retirement plans or IRAs that are set up as part of a plan sponsored and maintained by an employer, as well as trustees and fiduciaries of Keogh Plans under which employees, in addition to self-employed individuals, are participants (together "ERISA Plans"), are governed by the fiduciary responsibility provision of Title 1 of the Employee Retirement Income Security Act of 1974 ("ERISA"). An investment in Shares by an ERISA Plan must be made in accordance with the general obligation of Fiduciaries under ERISA to discharge their duties (i) for the exclusive purpose of providing benefits to participants and their beneficiaries (ii) with the same standard of care that would be exercised by a prudent man familiar with such matters acting under similar circumstances; (iii) in such a manner as to diversify the investments of the plan, unless it is clearly prudent not to do so; and (iv) in accordance with the documents establishing the plan. Fiduciaries considering an investment in the Units should accordingly consult their own legal advisors if they have any concern as to whether the investment would be inconsistent with any of these criteria.

Fiduciaries of certain ERISA Plans which provide for individual accounts (for example, those which qualify under Section 401(k) of the Code, Keogh Plans and IRAs and which permit a beneficiary to exercise independent control over the assets in his or her individual account, will not be liable for any investment loss or for any breach of the prudence or diversification obligations which results from the exercise of such control by the beneficiary, nor will the beneficiary be deemed to be a fiduciary subject to the general fiduciary obligations merely by virtue of his or her exercise of such control. On October 13, 1992 the Department of Labor issued regulations establishing criteria for determining whether the extent of a beneficiary's independent control over the assets in his or her account is adequate to relieve the ERISA Plan's fiduciaries of their obligations with respect to an investment directed by the beneficiary. Under the regulations, the beneficiary must not only exercise actual, independent control in directing the particular investment transaction, but also the ERISA Plan must give the participant or beneficiary a reasonable opportunity to exercise such control, and must permit him to choose among a broad range of investment alternatives.

**Prohibited transactions**

Trustees and other fiduciaries making the investment decision for any qualified retirement plan, IRA or Keogh (or beneficiaries exercising control over their individual accounts) should also consider the application of the prohibited transactions provisions of ERISA and the Code in making their investment decision. Sales and certain other transactions between a qualified retirement plan, IRA or Keogh Plan and certain persons related to it (e.g. a plan sponsor, fiduciary or service provider) are prohibited transactions. The particular facts concerning the sponsorship, operations and other investments of a qualified retirement plan, IRA or Keogh Plan may cause a wide range of persons to be treated as parties in interest or disqualified persons with respect to it. Any fiduciary, participant, or beneficiary considering an investment in Shares by a qualified retirement plan, IRA or Keogh Plan should examine the individual circumstance of that plan to determine that the investment will not be a prohibited transaction. Fiduciaries, participants or beneficiaries considering an investment in the Shares should consult their own legal advisors if they have any concern as to whether the investment would be a prohibited transaction.

**Special Fiduciary Considerations**

Regulations issued on November 13, 1986, by the Department of Labor (the "Final Plan Assets Regulations") provide that when an ERISA Plan or any other plan covered by Code Section 4975 (e.g., an IRA or Keogh Plan which covers only self-employed persons) makes an investment in an equity interest of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940, the underlying assets of the entity in which the investment is made could be treated as assets of the investing plan (referred to in ERISA as "plan assets"). Programs which are deemed to be operating companies or which do not issue more than 25% of their equity interests to ERISA Plans are exempt from being designated as holding "plan assets." Management anticipates that the Corporation would be characterized as an "operating company" for the purposes of the regulations, and that it would therefore not be deemed to be holding "plan assets."

Classification of the assets of the Corporation as "plan assets" could adversely affect both the plan fiduciary and management. The term "fiduciary" is defined generally to include any person who exercised any authority or control over the management or disposition of plan assets. Thus, classification of Corporation assets as plan assets could make the management a "fiduciary" of an investing plan. If assets of the Corporation are deemed to be plan assets of investor plans, transactions that may occur in the course of its operations may constitute violations by the management of fiduciary duties under ERISA. Violations of fiduciary duties by management could result in liability not only for management but for the trustee or other fiduciary of an investing ERISA Plan. In addition, if assets of the Corporation are classified as "plan assets," certain transactions that the Company might enter into in the ordinary course of its business might constitute "prohibited transactions" under ERISA and the Code.

Exhibit _____ Page__46__

**Reporting of Fair Market Value**

Under Code Section 408 (i) as amended by the Tax Reform Act of 1986, IRA trustees must report the fair market value of investments to IRA holders by January 31 of each year. The IRS has not yet promulgated regulations defining appropriate methods for the determination of fair market value for this purpose.

In addition, the assets of an ERISA Plan or Keogh Plan must be valued at their "current value" as of the close of the plan's fiscal year in order to comply with certain reporting obligations under ERISA and the Code. For purposes of such requirements, "current value" means fair market value where available. Otherwise, current value means the fair value as determined in good faith under the terms of the plan by a trustee or other named fiduciary, assuming an orderly liquidation at the time of the determination. The Company does not have an obligation under ERISA or the Code with respect to such reports or valuation reports. There can be no assurance, however, that any value so established (i) could or will actually be realized by the IRA, ERISA Plan or Keogh Plan upon sale of the Units or upon liquidation of the Company, or (ii) will comply with the ERISA or Code requirements.

# [INTENTIONALLY LEFT BLANK]

Exhibit ___1___ Page ___47___

# CERTAIN TRANSACTIONS AND CONFLICTS OF INTEREST

The Officers and Directors of the Corporation are required by law to deal fairly and in good faith with the Corporation and its Shareholders. Nevertheless, the Officers and Directors are subject to various potential conflicts of interest arising out of their relationship with the Corporation and its Shareholders. Moreover, all agreements and arrangements, including those relating to compensation of the Officers and Directors, are not the result of arm's-length negotiations. Management is acutely aware of these potential conflicts, and fully understands the legal and ethical fiduciary obligations to this Corporation and its Shareholders. Further, Management is confident that the affairs of the Corporation can be professionally managed solely for the benefit of the Corporation and the Shareholders.

Following are additional actual or potential conflicts between the Officers, Directors and the Shareholders.

### Competition for Management Services; Devotion of Time by the President

The Officers and Directors of the Corporation will have conflicts of interest in allocating management time, services, and functions between the Corporation, on the one hand, and any other businesses or business ventures in which they may be involved. Nevertheless, in the opinion of Management, they are fully capable of discharging their responsibilities to all such activities, and will devote to the Corporation as much of their time as is, in their judgment, reasonably required.

Such conflicts, real or apparent, will not be passed upon or ratified by an independent management board or any committee formed for such purposes, unless, in the opinion of Management, such a board or committee should become necessary or beneficial to the Corporation. In such event, and upon the decision of the management board, the Corporation's then current Presidents may elect or appoint temporary independent or "outside directors" for the purpose of deciding such issues which the then current Officers and Directors determine are necessary. However, the Officers and Directors shall not be required to elect or appoint such outside Presidents and shall not be bound by their recommendations, subject to applicable law.

### Nonexclusivity; Competing Businesses

The employment agreements entered into between the Corporation and its Officers and Directors provide that they cannot complete with the Corporation in the development and/or management, leasing and sale of real estate properties in direct competition with the Corporation. However, provided such activities are not in competition, the Officers and Directors may, alone or with others, engage in businesses of every kind and nature, and the Shareholders have no right, by virtue of their ownership of the Shares, to participate in such activities.

### Contracts with Related Parties and Affiliates

The Corporation has previously and may continue to enter into binding contracts with related parties and affiliates to provide services or materials to the Corporation, such as asset management, facilities management, bookkeeping, accounting, legal representation, brokerage representation, insurance, administrative and operational arrangements. Management believes that the terms of such transactions are, and will in the future be, no less favorable to the Corporation than would have been obtained from unaffiliated third parties in similar transactions. However, it must be noted that no independent auditor or underwriter has passed upon the reasonableness or fairness of any of the proposed or consummated transactions undertaken by the Corporation and the Corporation does not intend to obtain a fairness opinion or letter from any legal counsel or accountant. Potential investors should recognize that the Corporation's contractual agreements with related parties and affiliates, subject to applicable law, may be on terms that actually are or appear to be made on terms less favorable than those negotiated at arm's-length with independent third-parties, and that such agreements, without independent review, may constitute additional risks which the potential investor must anticipate before investing in the Shares offered hereby.

Management does not intend to conduct any operation in a manner designed to benefit Shareholders of Management, or any of them, individually at the expense of the Corporation or its Shareholders. However, if any of these conflicts arise, no assurance can be given that they can or will be successfully resolved or that such conflicts, if successfully resolved, will be resolved in a manner beneficial to the Corporation and its Shareholders. In addition, the arrangements, agreements, contracts and obligations entered into by the Corporation's officers with the other businesses may actually be, or appear to create conflicts of interest in and among the various entities and persons

Exhibit ___l___ Page __48__

## REPORTS TO SHAREHOLDERS

The Corporation will provide to its Shareholders (i) an Annual Report containing financial statements of operations, balance sheet, and a report of operations during the prior fiscal year and (ii) a 1099 setting forth the amount, if any, of Dividends distributed to the Shareholders each year.

## ANNUAL MEETINGS

The Corporation will hold an annual meeting of shareholders each year. The meeting will be held in June of each year either at the headquarters of the Corporation in Anaheim, California, at a venue suitable for such meeting, or at another location near one of the principal properties of the Corporation.

## SALES LITERATURE

The Corporation has not authorized any sales material to be used in connection with this offering except for this Memorandum, and other than those materials accompanying this Memorandum. No offer or sale of the Corporation's Shares is made or can be implied by any materials other than this Memorandum, and no offer or sale of the Corporation's Shares is made or can be implied where such an offer is illegal or contrary to law.

## ACCESS TO INFORMATION

Prospective investors and/or their representatives are invited to review any materials available to the Corporation relating to this Offering or anything referred to in or accompanying this Memorandum, provided such review takes place during normal business hours after at least forty-eight hours prior notice. Such information is available at the offices of the Corporation, as follows:

**EAGLE DEVELOPMENT ENTERPRISES, INC.**
**2125 East Katella Avenue, Suite 350**
**Anaheim, California 92806**
**(1)(800) 394-9868**

In addition, the Officers will answer any appropriate inquiries from prospective investors and/or their representatives concerning the Corporation and any other matters relating to this Offering. In addition, the President will afford each prospective investor and his or her personally representative the opportunity to obtain any additional information within the Corporation's possession necessary to verify the accuracy of any assumptions, representations, or information set forth in this Memorandum other than confidential information regarding any of the Properties which the Corporation may have an interest in acquiring in the future.

Exhibit ___/___ Page __49__

**APPENDICES**

A-1          Financial Information

C-1          Subscription Agreement and Purchaser Questionnaire

D-1          IRA Subscription Documents

Exhibit ___)___ Page___50___

**[INTENTIONALLY LEFT BLANK]**

[INTENTIONALLY LEFT BLANK]